NEW YORK CENTRAL RAILROAD CO. *v.* CALVERT.

1. APPEAL AND ERROR—STIPULATED FACTS PRESENTING QUESTION OF LAW—REVIEW.

Where, in a case tried by the court without a jury, the stipulated facts presented a single controlling legal question, on error, the Supreme Court will consider whether the judgment is supported by the facts, although Circuit Court Rule No. 45 was not complied with; there being no findings of fact by the court or written requests therefor.

2. CARRIERS—INTERSTATE COMMERCE—TARIFF RATES—RE-CONSIGNMENT CHARGE—EVIDENCE—ADMISSIBILITY.

While plain tariff provisions cannot be altered by custom, intention of the framers, or understanding of the parties, yet where the actual meaning of a provision is open to construction in the connection used and claimed to be contrary to that adopted in administrative adjudication by the interstate commerce commission, the existing facts and circumstances attending its adoption and the practical construction given it by the officers whose duty it is to administer the law under which it was adopted are competent to consider.

3. SAME—NOTICE TO CONSIGNEE NOT A CONDITION PRECEDENT.

In an action by a railroad company for re-consignment charges under a tariff filed with the interstate commerce commission, providing for such charge unless re-consignment orders were received by plaintiff prior to the arrival of the cars in Detroit, and further providing that on request plaintiff would notify consignees in Detroit of the arrival of cars at points outside of Detroit so that such re-consignment orders might be given, evidence that the giving of said notice was practically impossible and that the charge was a reasonable one, *held*, to justify a finding that the giving of said notice was not a condition precedent to the valid assessment of said charge.

4. SAME—APPEAL AND ERROR—EVIDENCE—HARMLESS ERROR.

Where plaintiff was both the "delivery railroad" and the

"carrier," and no other railroad participated in the re-
consignment charges, testimony by plaintiff's chief car
clerk, explaining the meaning of said terms as applied
to the tariff by railroad men, *held*, although erroneous
because irrelevant and immaterial, not prejudicial.

Error to Wayne; Barton (Joseph), J., presiding.
Submitted October 24, 1922.    (Docket Nos. 55-58.)
Decided April 27, 1923.

Separate actions of assumpsit by the New York
Central Railroad Company against George T. Calvert
and others, Pittmans & Dean Company, J. & T.
Hurley, Inc., and Andrew Lorimer and others for re-
consignment charges.    Judgments for plaintiff.    De-
fendants bring error.    Affirmed.

*Millis, Streeter & Berns,* for appellants.

*Angell, Turner & Dyer,* for appellee.

STEERE, J.    By agreement of counsel the four above
entitled actions, separately begun on May 1, 1919,
were tried together before the circuit court without a
jury mainly on stipulated facts, resulting in judgments
for plaintiff.    Defendants have brought them to this
court for review on separate writs but like assign-
ments of error.    They have been argued and sub-
mitted together by consent of counsel, it being con-
ceded that they involve like controlling facts and ques-
tions of law.

Defendants are coal dealers located and doing
business in the city of Detroit.    The New York Cen-
tral Railroad Company brought these actions against
them to recover re-consignment charges of $2 for each
car on shipments of coal and other freight trans-
ported in car load lots over its line from points out-
side of this State during the years 1913, 1914, and
1915, originally consigned to defendants at Detroit,

Michigan, and, on their request after arrival of the car in the Detroit switching district, re-consigned, switched and placed on their various private side-tracks within the Detroit switching district. Plaintiff claims and defendants deny that this re-consignment charge of $2 per car was "a proper, lawful and necessary charge under the tariffs in force" during those three years.

To simplify the facts and issues counsel for the respective parties filed a detailed stipulation of agreed facts. The only testimony taken in the case was that of a witness named Connell, plaintiff's chief car clerk, who testified, against defendants' objection, that he had charge of moving all its in-bound freight, including the cars in question, and the re-consignment charges were assessed by the car department under his supervision according to the tariff in force at that time with which he was familiar, and he was also familiar with the meaning of terms used in handling and switching cars as understood by railroad men. He was then asked and answered as follows:

"*Q.* Will you state whether there is any difference in the meaning as used in connection with the handling of cars, delivery shipments, and so forth, between the carrier and the delivering railroad?

"*A.* Yes, sir. * * *

"*Q.* Well, as those words are used in railroad matters. In this tariff as well as by railroad men generally; by people qualified to and who know the meaning usually attributed to those words in connection with railroad matters? * * *

"*A.* The difference between the carrier and the delivery line is the carrier is the road that participates in the freight revenue of that car. The delivery line is the road on whose rails the car is delivered. By delivery of the shipment I mean the one who takes it in and unloads it. I mean that it is the railroad on whose line the car is unloaded. With the cars in question in this case the carrier was the New York Central railroad. No other carrier in Detroit partici-

pated in the revenue. * * * In connection with the cars which are in question in this case I presented a statement in detail covering these charges and made a demand on the defendant in 1916."

To this line of inquiry counsel for defendants timely objected on the following grounds:

"Those questions are to be determined by the court from an inspection of the tariff as published rather than from the opinion of some clerk, who said that he is a car clerk; who does not qualify as a tariff expert, or come in here to aid the court with the interpretation of technical words used, other than their common meaning."

In reply to a question by opposing counsel, supplemented by one from the court, plaintiff's counsel said the object of calling this witness was "to explain how those terms were regarded by men in railroad affairs and attempting to explain the words in the tariff." The tariff referred to, under the terms of which plaintiff claims the right to recover, reads as follows:

"Rule 9 of L. S. & M. S. Tariff I. C. C. A.-2662, as amended by Supplement No. 26, in force from Jan. 11, 1913, to July 2, 1916, as to general carload freight, and Rule 4 of L. S. & M. S. Tariff I. C. C. A-2906, in force from Jan. 11, 1913, to January 19, 1915, as to coal, coke and iron ore; RE-CONSIGNMENT OF CAR LOAD SHIPMENTS AT DETROIT, MICHIGAN.

"Detroit Switching District.   On car load traffic consigned for delivery within the switching limits of the City of Detroit, Michigan (switching limits extend from Brush Street Station to River Rouge Bridge, south of Delray), the billing from point of origin must show name of consignee and specific delivery (See Note 1) required.

"A re-consignment charge of $2 per car will be assessed for any change in billing as originally made, affecting either consignee, destination or delivery, except when re-consigning orders are received by the agent of the L. S. & M. S. Ry. prior to arrival of

cars in Detroit Switching District.     Upon written request the L. S. & M. S. Ry. will notify consignees at Detroit, Michigan, of the arrival of cars on rails of the L. S. & M. S. Ry. at Adrian, Michigan, or Toledo, Ohio.

"Note 1—By 'specific delivery' is meant the private siding or team track of delivering railroad required. The specific private siding must be named if consignee has more than one, it being understood that as regards team track deliveries, roads do not obligate themselves to place cars on any specific track of a connecting carrier within switching limits of Detroit, Michigan, except as specifically provided for in the switching tariffs of delivering carriers on file with the Interstate Commerce Commission or the Michigan Railroad Commission."

The Lake Shore & Michigan Southern Railway is a part of the New York Central system and it is conceded the latter has succeeded to all the former's "rights and responsibilities in connection with the movement and transportation of the cars herein involved."

When the parties rested counsel for defendant requested findings of fact and conclusions of law. The court thereafter filed an opinion which briefly states the nature of the actions, that the cases were heard together by agreement of counsel with the main facts stipulated and "certain testimony taken as to the meaning of 'delivering railroad' and time when demand for payment was made upon defendants," that no written requests for findings were filed or points of law presented under Circuit Court Rule No. 45, with conclusions upon the legal questions involved, as follows:

"The court finds, as a matter of law, that the giving of the so-called 'passing notice' as to the arrival of cars at Adrian, Michigan, or Toledo, Ohio, was not a condition precedent to the valid assessment of the reconsigning charges provided in the tariff; that all reconsigning charges shown by the stipulated facts to

have accrued prior to May 1, 1913, are barred by the statute of limitations; that the charges shown by the stipulation to have accrued on or subsequent to that date are valid charges under the tariff, and plaintiff is entitled in these actions to recover the respective amounts thereof, together with interest thereon, at the legal rate, from the date of demand made on defendants, which the testimony shows occurred in all cases prior to January 1, 1917. It follows, therefore, that judgment may be entered in favor of the plaintiff and against defendants, respectively, for the charges shown by the stipulated facts to have accrued on or subsequent to May 1, 1913, together with interest thereon, at the legal rate, from January 1, 1917."

Defendants made a motion for a new trial which was denied.

Plaintiff's counsel urge the preliminary objection in their brief that, as no findings of fact were made by the court nor written requests for special findings or points of law presented to the court as upon requests to charge, and no amendments proposed to the findings made or exceptions taken in that connection, there is nothing before the court for consideration under Circuit Court Rule No. 45, as interpreted in various cases cited and the decision of the lower court should therefore stand affirmed.

While that situation at least eliminates most questions which might be raised under strict compliance with the rule, we have here a full stipulation of undisputed facts which the trial court apparently assumed as a proper basis for his written conclusions of law, and those facts as stipulated present a single controlling question of law. Counsel for defendants say in their brief that aside from error assigned on the admission of testimony given by plaintiff's witness, Connell, "the real question in the case relates to a proper construction of the tariff; that is to say, the remaining assignments of error are all covered and can be disposed of by a determination of that legal

question." Under such a situation, with the facts as stipulated presenting a single controlling legal question, it is proper for the court to consider "the contention made in substance and effect in the assignments of error and argued in the briefs, whether they support the conclusion of law—the judgment." *Oscar Daniels Co.* v. *City of Sault Ste. Marie,* 208 Mich. 363.

It appears by the stipulation that all the cars under consideration were moved in interstate commerce over plaintiff's line into Detroit, their point of destination, and in their delivery were subject to the tariff quoted. The number of cars re-consigned by plaintiff for each of the defendants during the years in question under the tariff rule is stipulated, and it is conceded by defendants' counsel that if the judgment of the trial court is well founded as a matter of law it should be affirmed without deduction. All these cars as originally consigned were "billed flat" to their destination, or to their respective consignees at Detroit, Mich., without further specifications as to delivery, requiring re-consignments to switch and transfer them to the various private sidings within the switching limits of Detroit.

The Calverts owned and operated private sidetracks at Maybury avenue on the New York Central; at Maybury avenue on the Michigan Central; at Jos. Campau avenue on the Michigan Central; at the River Rouge yard on the Michigan Central; and at Kercheval avenue on the Michigan Central belt. Pittmans & Dean Company had sidetracks at Woodward avenue on the New York Central; at Humboldt avenue on the Grand Trunk; at Rivard street on the Grand Trunk; at Beaubien street on the Michigan Central; in Highland Park on the Detroit Terminal west. J. & T. Hurley, Inc., at Grand River avenue on the New York Central; at 14th and 15th streets on the New York Central; at Gratiot avenue on the Grand Trunk; and

at Kercheval avenue on the Detroit Terminal east. J. S. Lorimer's Sons owned no sidetracks.

Soon after this tariff went into effect, January 11, 1913, a circular letter was received from the agent of the Lake Shore & Michigan Southern Railway Company by defendants calling attention to and quoting Rule No. 9, saying in part:

"Owing to the arrival of many cars of car load freight with no specific delivery shown on billing, due partially to the unfamiliarity with the above quoted tariff, thereby making it compulsory for us to charge $2 per car for re-consigning, we would thank you to acknowledge receipt of this letter and state if you wish to be notified upon arrival of cars at Toledo, Ohio, and Adrian, Michigan."

In response defendants sent requests to be notified of arrival of cars at Toledo and Adrian as suggested, but no such so-called "passing notice" was given by plaintiff as to any of these cars because, as plaintiff claims and the interstate commerce commission found, it proved to be impossible under existing conditions to do so in time for defendants to send back a re-consigning order before the cars would arrive at their destination. The movement and handling of the cars after their arrival in Detroit before they were finally placed and delivered for unloading is stated in the stipulation as follows:

"8. A train of cars carded at Toledo for Detroit is brought into the plaintiff's terminal yard at Detroit. Each car on the train is covered by a waybill made out by the agent at the point of origin (see Exhibit 1). Upon the arrival of the train the conductor brings into the yard office the waybills for the entire train, one for each car. A clerk in the yard office, called the car checker, takes these waybills and makes up a train sheet (Exhibit 2) for the entire train. This train sheet shows, on the top lines, the name of the terminal, the date, the name of the conductor, and time of arrival. In the body of the train sheet is shown,

as to each car, the following data: Car initial and number, point of origin, contents, weight, consignee, and, where it appears by the waybill or from advance orders given by consignee, the delivery.

"9. From this train sheet the car checker then makes out a card (Exhibit 3) for each car. Each card bears a number in bold red type which signifies to the switching crew that the car is to be switched to the track corresponding to that number. For example, to track No. 7 are switched cars for Grand Trunk delivery, that is, sidetracks on the Grand Trunk. Track No. 3 is for Detroit Terminal deliveries; No. 6 is for Michigan Central deliveries; No. 10 is for Pere Marquette deliveries; No. 2 is for Russell street delivery of the New York Central; No. 13 is for 'Hold' track. On the three bottom lines of the cards is entered specific information, where this is shown by the train sheet, as to the particular consignee, railroad, and track to which the car is to be delivered. But where the waybill and train sheet do not show such specific delivery but only the name of the consignees, the card is marked 'Hold' and is numbered 13, and the car in such case is shunted by the switching crew onto the 'Hold' track, to be held temporarily for orders from consignee as to specific delivery desired. This has to be done in every case where the waybill does not show specific delivery and the railroad office has not a standing or advance order from the consignee as to where the particular car is to be delivered. These latter orders are the so-called 're-consigning orders' mentioned in the second paragraph of the rule set forth in paragraph 4 of this stipulation, as received by the railway agent prior to arrival of cars in the Detroit switching district, for compliance with which no charge is imposed.

"10. The consignee of each of the cars carded to the 'Hold' track is then notified by telephone and by post-card of their arrival, and is asked to give disposition. He informs the railroad office where the car is to be delivered, that is, the specific sidetrack on the New York Central or some other railroad. From this information the car checker changes the billing on the car and replaces the number 13 card with new cards showing the specific delivery requested

and also the new consignee, if one is indicated by the original consignee. These 'Hold' cars are then distributed by the switching crews to the various other tracks, as described above, for immediate switching and delivery to the specific sidetrack indicated by the new card and billing.

"11. Each of the cars involved in this case and included in the table annexed hereto was a 'Hold' car, and was billed, handled, and re-consigned in the manner just described. It was these operations and transactions which plaintiff claims invoked the rules above quoted and a re-consigning charge of two dollars ($2.00) on each car.

"12. The operations described above and the ultimate delivery were all within the switching limits of Detroit as described in the tariff rules. * * *

"17. Subject to the facts set forth in this stipulation the conditions in the years 1913-1915 affecting the movement and re-consigning of the cars involved herein were the same as those described in the opinions and reports of the interstate commerce commission in the *Detroit Re-consigning Case* on the original and supplemental hearing reported in 37 I. C. C. 274 and 46 I. C. C. 231. The said opinions and reports, together with the orders in that case, are herein considered in evidence. It is not admitted, however, that any of the parties hereto is concluded by the said reports and findings of the interstate commerce commission in the *Detroit Re-consigning Case* as to other facts and matters contained in this stipulation and not appearing in said reports and findings of the interstate commerce commission in the *Detroit Re-consigning Case.*

"18. The defendants were all members of the Detroit Coal Exchange at the time it filed its petition to intervene in the *Detroit Re-consigning Case,* before the interstate commerce commission, hereinbefore referred to, and the Detroit Coal Exchange was a party to that proceeding with their consent and approval."

The question of re-consignment of car loads of coal at the Detroit terminal has been before the interstate commerce commission on at least four different oc-

casions. In *Detroit Traffic Ass'n* v. *Railway Co.*, 21 I. C. C. 257, plaintiff filed a petition in 1910 challenging the validity of a charge by defendant of $3 per car for re-consignment of coal shipped from points in Ohio and elsewhere. In that case Commissioner Lane took pains to go quite fully into explanation and discussion of the subject of re-consignment in railway transportation. The opinion recognized that as a rule re-consignment in transit is usually allowed without additional charge, but re-consignment at terminal, on the other hand, usually involves a special charge. Reasons giving rise to the distinction are stated, and it is noted that "in handling of coal the greatest difficulty to be overcome arises from the irregularity of demand." After full discussion of conditions shown at the Detroit terminal compared with other points it was held the amount exacted was excessive, but $2 per car was not unreasonable and such charge was permissible.

In the *Detroit Re-consigning Case*, 25 I. C. C. 392, submitted December 6, 1912, the subject was again considered on a showing of congested conditions at the Detroit terminal, charged by the carriers into Detroit to inefficient operation of their connecting carriers beyond Toledo, and it was there held that the re-consignment charge of $2 per car was not unreasonable considered by itself, but directed that under the facts shown the carrier should give notice to the consignee of the arrival of the coal cars on their respective tracks at Toledo, and state in their tariffs that said charge would not be imposed if a re-consigning order was given by the consignee before the car reached Detroit, the opinion concluding,

"We shall, however, hold the whole record before us for such further orders in the premises as experience during the coming winter, under the plan here proposed, may require."

This was followed by the tariff of January 11, 1913, involved here, which was in effect during the period covered by this controversy and as to which it is stipulated that, subject to the facts stated in the stipulation, the conditions affecting car movement and re-consignment were the same as those described in the opinions appearing in the 37th and 46th I. C. C. reports, wherein it is squarely held that the provisions of this tariff did not make the imposition of the $2 reconsigning charge conditional upon the terminal carrier having first given the consignee at Detroit notice that the car had arrived at Toledo.

In those cases, entitled *Detroit Coal Co.* v. *Railroad Co.*, the commission had before it substantially the issue involved here, and by the stipulation the opinions, reports and orders they contain are evidence in this case. They cover the original and supplemental hearing on plaintiff's application for reparation where re-consignment charges were paid and authority not to pay the charge when payment had not been made by the consignee.

It appears from the report, or opinion, in the 37th I. C. C. 274, that it was in a sense a rehearing, or further hearing, of the case reported in the 25th I. C. C. 392. It was asked for in the fall of 1914 by defendant and other interested carriers, who alleged that the practice had proved unsatisfactory to both shippers and carriers and had worked out unequally and inequitably between receivers of coal in car load lots. In the report of this further hearing (37 I. C. C. 274) it is stated in part that—

"early during the hearing it developed that the situation at Detroit had materially changed since our report in the *Detroit Re-consigning Case, supra,* was handed down.   *   *   *   The condition of extreme congestion in the terminals proper such as prevailed in the winter of 1911-12 being reflected back along the line, gave ample time for the carriers to issue the notice

and for the consignees to place their re-consigning order.     Improved conditions at Detroit were likewise reflected back along the line to Toledo, and transportation from that point to Detroit soon came to require less time than during the period of congestion. *   *   *   The clerical work necessary, the time consumed in relaying the information from one office to another, and other incidents attending the preparation and service of passing notices often rendered it impossible to deliver the notice to the consignees at Detroit before the arrival of the car at that point. Moreover, the offices of the consignees were ordinarily closed from 5 p. m. until 9 a. m. of the next day, and no notice could be delivered between these hours or on Sundays or holidays.   *   *   *   Had the giving of the passing notice been a condition precedent, which we have held it was not, to the assessment of a re-consigning charge, it clearly appears that it would have worked inequitably and would not have been free from discriminatory results.  We are of the opinion that the failure of the carriers to make the assessment of the $2 re-consigning charge conditional upon the giving of passing notice has not rendered such a charge unreasonable.   *   *   *   These charges, we have held, were legal under the provisions of the tariff and, being not unreasonable, the law requires that they should be paid.    The complaint will be dismissed."

In 46 I. C. C. 231, where the subject is again reviewed, it was said of the conditional provision in the tariff relative to notice:

"The more substantial basis for the proposal was a practical and earnest effort on the part of the carriers to keep their terminals clear and to relieve an unprecedented congestion at Detroit caused chiefly by the great quantities of coal held there for re-consignment   *   *   *   How it would work out was a question that could be determined only by experience; *   *   *   But, as should be carefully noted, in considering the reasonableness of the proposed charge itself, we said (*id.* p. 395):

" 'On the record we find   *   *   *   that the proposed charge is not unreasonable when considered by itself and wholly apart

from the conditions that have occasioned the congestion at Detroit, or in a material measure contributed to it.'

"The success of the plan of giving the passing notice from Toledo being more or less uncertain, we purposely refrained from entering the order, feeling that no definite requirements under an order should be imposed upon the carriers, at least until we had been informed more fully as to the outcome of what was a measure of expediency in a purely experimental stage. * * * It is true that language is used in that part of the report that is not as clear as it should have been, but a careful reading of the entire report, we think, will fail to disclose any modification of the definite finding there made, namely, that the $2 charge, when considered by itself and wholly apart from the condition that occasioned the congestion was a reasonable charge for the service. Any other finding would have been wholly inconsistent with the facts shown of record and also with the conclusions and findings in *Detroit Traffic Ass'n* v. *Railway Co.*, 21 I. C. C. 257. * * * We * * * again conclude and find that the charge in question was reasonable and, as published in the tariff of the respondents, was not conditioned upon the giving by the carriers to the consignees of a passing notice from Toledo."

While it is the general rule, as defendants' counsel point out, that plain tariff provisions cannot be altered by custom, intention of the framers or understanding of the parties, yet, where the actual meaning of a provision is open to construction in the connection used and claimed to be contrary to that adopted in administrative adjudication by the commission, the existing facts and circumstances attending its adoption and the practical construction given it by the officers whose duty it is to administer the law under which it was adopted are competent to consider.

In *Great Northern R. Co.* v. *Merchants Elevator Co.*, U. S. Adv. Ops. 1921-22, p. 551 (42 Sup. Ct. 477), where the question of a condition in a tariff was involved, the court held in substance that while without

resort to the commission construction of a tariff could be raised in a State court, yet whether a rate was discriminatory, unreasonable or the words used had a special technical meaning must be first determined by the commission.

In this case the record discloses that in the exercise of its administrative functions the commission determined under the existing facts as it found them during the period covered by this contention that had the giving of a passing notice been a condition precedent to the re-consignment charge it would have worked inequitably with discriminatory results, while in itself the charge was reasonable and proper.

It does not appear that the commission determined whether the words "delivering railroad" had any special technical meaning as found in the tariff beyond what they would imply in common use. If they have a technical meaning which might affect the rights of these parties it would primarily be for the commission to so determine, but under the situation disclosed here neither the commission nor the trial court so found.

The technical distinction claimed by counsel as affecting construction of the tariff is between the words "delivering railroad" and "carrier." In this case the one railroad both carried and delivered. Those cars were taken into Detroit, handled and delivered by plaintiff. No other railroad is shown to have participated in their transportation and delivery at Detroit or the revenue therefor. In fact and for all practical purposes plaintiff was both the carrying and delivering railroad. While admission of Connell's testimony on that subject was technical error, because irrelevant and immaterial as defendants' counsel contended, it was not prejudicial error. The trial court made no finding on the subject and reached a right decision, as we conclude, on the ground that a passing notice

was not a condition precedent to the re-consigning charge, which the commission by administrative adjudication in the exercise of administrative discretion found was in itself reasonable and not discriminatory.

We find no occasion to disturb the trial court's construction of the tariff in question, and the judgments will stand affirmed.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, and SHARPE, JJ., concurred.   MOORE, J., did not sit.