PEOPLE, *ex rel.* ATTORNEY GENERAL, *v.* DETROIT ASPHALT PAVING CO.

1. MONOPOLIES—DEFINED.

> A monopoly, in the modern sense, is created when, as a result of efforts to that end, previously competing businesses are so concentrated in the hands of a single person or corporation, or a few persons or corporations acting together, that they have power to practically control the prices of commodities and thus to practically suppress competition.

2. STATUTES—CONSTRUCTION—MONOPOLIES—RESTRAINT OF TRADE.

> In construing statutes to prevent trusts, monopolies, and combinations of capital to restrict trade, the rule of reason should be applied.

3. CORPORATIONS—MONOPOLIES—RIGHT TO DO BUSINESS—QUO WARRANTO.

> In *quo warranto* proceedings by the State to annul the charter of a corporation, and oust it from longer doing business in the State, on the ground that it is a trust and monopoly within the meaning of Act No. 255, Pub. Acts 1899 (3 Comp. Laws 1915, §§ 15013–15026), as amended by Act No. 60, Pub. Acts 1925, and Act No. 329, Pub. Acts 1905 (3 Comp. Laws 1915, §§ 15033–15039), the finding of the trial court that the State had not established, as matter of fact or law, that defendant was a trust or monopoly within the meaning of said statutes, *held*, supported by the record.

Error to Ingham; Carr (Leland W.), J. Submitted April 26, 1928. (Docket No. 141, Calendar No. 33,583.) Decided October 1, 1928.

Information in the nature of *quo warranto* by the people of the State of Michigan, on the relation of Clare Retan, attorney general, against the Detroit Asphalt Paving Company to annul its corporate franchise. Judgment for defendant. Plaintiff brings error. Affirmed.

*Wilber M. Brucker*, Attorney General, and *Harold J. Waples*, Assistant Attorney General, for appellant.

*Lightner, Oxtoby, Hanley & Crawford (Peter J. Monaghan* and *David H. Crowley*, of counsel), for appellee.

The attorney general filed an information in the nature of *quo warranto* in the circuit court for the county of Ingham against the defendant, Detroit Asphalt Paving Company, a Michigan corporation, seeking to annul its franchise and oust it from longer doing business in the State on the ground that it was· a trust and monopoly within the meaning of Act No. 255, Pub. Acts 1899 (3 Comp. Laws 1915, §§ 15013–15026), as amended by Act No. 60, Pub. Acts 1925, and Act No. 329, Pub. Acts 1905 (3 Comp. Laws 1915, §§ 15033–15039). There had been a prosecution conducted in the recorder's court of Detroit, apparently at the instigation of the city, with two trials, each resulting in disagreement of the jury. The testimony taken on these trials was submitted to and considered by the trial judge in disposing of this case. It is not incorporated in this record; instead, an agreed statement of facts which includes

a few excerpts from the testimony is printed as a bill of exceptions. The trial judge filed a written opinion. He reached the conclusion that the State had failed to establish its charge. Liberally construing his opinion, it may be treated as a finding that the State had not established as matter of fact or of law that defendant was a trust or monopoly within the meaning of the acts referred to. Judgment for defendant was entered. Under the assignments of error and the state of the record, we may only consider whether the agreed facts support the conclusion of law, the judgment. *Oscar Daniels Co. v. City of Sault Ste. Marie,* 208 Mich. 363; *New York Cent. R. Co.* v. *Calvert,* 222 Mich. 488.

From the agreed statement of facts and the meagre excerpts from the testimony, it would appear that prior to 1914 but a small amount of asphalt pavement was constructed in Detroit, and such as was constructed was finished by the city itself laying the sheet asphalt. It owned a plant equipped for that purpose and it fixed the price at which it would lay such sheet asphalt, and contractors made their bids accordingly. At this time there were four leading contractors in the city who among other activities built sewers, laid pavements, and did other work for the city under contract. They were William E. and Thomas E. Currie who did business as a partnership and later as a corporation, and John A. Mercier, Richard Porath, and Julius Porath, each of whom operated alone.

In 1913 the city decided that it would change the surfacing from sheet asphalt to what was known as asphaltic concrete pavement. It is said that this change was somewhat experimental. The city at the same time decided that it would get out of the asphalt business, although its plant, with slight

changes, could take care of the new work; it decided to let the entire contract, surfacing and all, under one bid. At this time there was an asphalt plant at Highland Park, but none in the city other than the one owned by the city. The capacity of the Highland Park plant does not appear. The contractors under this new plan of the city had to make new arrangements or quit laying asphaltic pavement. On April 20, 1914, they organized defendant corporation with an authorized capital of $50,000, of which but $28,000 was paid in. Thereafter the defendant has bid for the contracts, done the asphaltic part of the job, amounting to about one-third of the work, and the other two-thirds has been sublet to the stockholders, usually giving preference in accordance with the location of the job. In some instances the stockholders have bid against defendant. Before the defendant was organized, the contractors named were doing about 80 per cent. of the paving work of the city, but this has since been reduced to about 71 per cent. The amount of asphalt pavement laid in the city has increased, and defendant has prospered; new plants have been constructed, usually at or near the plants of its stockholders. It does not seem to have any customer other than the city, which deals with it through competitive bids.

FELLOWS, J. *(after stating the facts)*. In the leading case of *Attorney General* v. *National Cash Register Co.*, 182 Mich. 99, 107 (Ann. Cas. 1916 D, 638), this court approved of the following definitions:

" 'A monopoly, in the modern sense, is created when, as a result of efforts to that end, previously competing businesses are so concentrated in the

hands of a single person cr corporation, or a few persons or corporations acting together, that they have power to practically control the prices of. commodities and thus to practically suppress competition.' *United States* v. *Tobacco Co.* (C. C.), 164 Fed. 700–721, and cases there cited.

" 'A monopoly exists where all or so nearly all of an article of trade or commerce within a community or district is brought within the hands of one man or set of men, as to practically bring the handling or production of the commodity or thing within such single control, to the exclusion of competition or free traffic therein.' Cooke on Combinations, Monopolies and Labor Unions (2d Ed.), § 116, and cases there cited."

The Sherman anti-trust act (26 U. S. Stat. p. 209) was enacted in 1890. It dealt with restraint of trade in interstate commerce. It was followed by similar legislation in various States of similar purport applicable to intrastate transactions. Some State courts and the lower Federal courts early reached the conclusion that the various acts applied to all transactions which in any way operated in restraint of trade, in reduction of competition, whether direct or incidental, reasonable or unreasonable, and the Federal Supreme Court gave color and encouragement to such construction. But such a construction could not long last unless all business was to be put in a strait-jacket. Two grocerymen in a small town could not combine their stocks in one store and form a partnership without lessening competition, and thus violating the anti-trust law of the State if such construction obtained. A county newspaper could not buy out its competitor without becoming amenable to the law. Illustrations could be multiplied. The Federal court of last resort had opportunity to and did clearly put itself on record as adhering to

the rule of reason in the case of *Standard Oil Co.* v. *United States,* 221 U. S. 1 (31 Sup. Ct. 502, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912 D, 734). The exhaustive opinion of Chief Justice White fully considers all the questions involved in the case, and it expressly settled the much mooted question as to whether the rule of reason should obtain in this country in proceedings under the anti-trust statutes. We quote somewhat at length from it. He said:

"In substance, the propositions urged by the government are reducible to this: That the language of the statute embraces every contract, combination, etc., in restraint of trade, and hence its text leaves no room for the exercise of judgment, but simply imposes the plain duty of applying its prohibitions to every case within its literal language. The error involved lies in assuming the matter to be decided. This is true because as the acts which may come under the classes stated in the first section and the restraint of trade to which that section applies are not specifically enumerated or defined, it is obvious that judgment must in every case be called into place in order to determine whether a particular act is embraced within the statutory classes, and whether if the act is within such classes its nature or effect causes it to be a restraint of trade within the intendment of the act. To hold to the contrary would require the conclusion, either that every contract, act or combination of any kind or nature, whether it operated a restraint on trade or not, was within the statute, and thus the statute would be destructive of all right to contract or agree or combine in any respect whatever as to subjects embraced in interstate trade or commerce, or if this conclusion were not reached, then the contention would require it to be held that as the statute did not define the things to which it related and excluded resort to the only means by which the acts to which it relates could be ascertained—the light of reason—the enforcement

of the statute was impossible because of its uncertainty. The merely generic enumeration which the statute makes of acts to which it refers and the absence of any definition of restraint of trade as used in the statute leaves room for but one conclusion, which is, that it was expressly designed not to unduly limit the application of the act by precise definition, but while clearly fixing a standard, that is, by defining the ulterior boundaries which could not be transgressed with impunity, to leave it to be determined by the light of reason, guided by the principles of law and the duty to apply and enforce the public policy embodied in the statute, in every given case whether any particular act or contract was within the contemplation of the statute.''

He then considers two cases which it was urged committed the court to a contrary doctrine, and said:

''But aside from reasoning it is true to say that the cases relied upon do not when rightly construed sustain the doctrine contended for is established by all of the numerous decisions of this court which have applied and enforced the anti-trust act, since they all in the very nature of things rest upon the premise that reason was the guide by which the provisions of the act were in every case interpreted.   *   *   *

''If the criterion by which it is to be determined in all cases whether every contract, combination, etc., is a restraint of trade within the intendment of the law, is the direct or indirect effect of the acts involved, then of course the rule of reason becomes the guide, and the construction which we have given the statute, instead of being refuted by the cases relied upon, is by those cases demonstrated to be correct.''

After the *Standard Oil Case* came down, the Federal courts and State courts generally accepted it and followed it in later decisions. However, before that case was decided this court had recognized that

the rule of reason should not be entirely overlooked. In *Grand Union Tea Co.* v. *Lewitsky,* 153 Mich. 244, it was said by Mr. Justice BLAIR, speaking for the court: '

"Originally, at the common law all contracts in restraint of trade were held to be invalid as against public policy. But considerations of public policy vary with the times and the progress of civilization, and contracts in restraint of trade have been very much limited by decisions of the courts and by statute, and—

" 'A doctrine has been introduced in some of the later cases, both English and American, which may be called the doctrine of the reasonableness of the restraint.' 9 Cyc. p. 529."

The situation is quite fully and clearly stated in 41 C. J. p. 109. We quote what was there said:

"In the earlier decisions of the United States Supreme Court construing the Sherman anti-trust act, expressions are found to the effect that every contract or combination, whether reasonable or unreasonable, which directly restrains or which necessarily operates in restraint of trade or commerce among the States or with foreign nations is unlawful under the statute. These expressions were very generally considered to be actual holdings and not *dicta,* both by the courts and the general public, and numerous decisions of the lower Federal courts held in accordance with this belief that the statute included all contracts or combinations in restraint of interstate trade or commerce or trade or commerce with foreign nations, although at common law they would have been considered in reasonable restraint of trade and, as such, legal. Subsequently, however, the expressions used by the United States Supreme Court in its early decisions were limited and qualified by that court which held that, as the statute does not define the term 'restraint of trade,'

it is necessary for the court to do so and that this duty can only be discharged by a resort to reason, and that the test to determine whether or not a given contract or combination is in restraint of interstate or foreign trade or commerce is the standard of reason as applied to like contracts or combinations at common law. In applying the rule of reason to the construction of the statute, the court held that, as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the anti-trust act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade or which, either because of their inherent nature or effect or because of the evident purpose of the acts, etc., injuriously restrained trade, the words as used in the statute were designed to have and did have but a like significance; and the court definitely and finally declared the rule to be that only undue or unreasonable restraints of interstate or foreign trade or commerce are prohibited by this statute, which does not forbid or restrain the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose. This rule, of course, has been followed and applied by all subsequent decisions of the lower Federal courts and of the State courts in which the question has arisen.''

If, then, the rule of reason is to be applied, as it should be, it becomes quite apparent that the State has failed to make a case of unreasonable restraint of trade. It must be patent from what has been stated that defendant corporation was not organized for such purpose. It was organized as a matter of necessity. When organized but a small percentage of Detroit pavement was being constructed of asphalt—the record shows but seven and one-half

per cent.; no one knew or could anticipate that it would increase as the record shows it has increased in later years; the city had closed its asphalt plant; none of the contractors could afford to maintain a plant for the limited amount of work. While size of the corporation is not controlling on the question of monopoly, it is significant that the sum of $28,000 was all that was put into a company which it is claimed was designed to monopolize the industry in Detroit. Defendant had but one customer, the city of Detroit. As a practical proposition, defendant could not fix an arbitrary price of its product. Its bids could be rejected by the city with or without reason, and the city could, by starting up its own plant, put defendant out of business in the twinkling of an eye. Instead of using practical methods to end defendant's existence, if its officers thought it should be ended, the city chose to institute lawsuit. Some parties prefer lawsuits to practical results.

In the *National Cash Register Case*, Mr. Justice STONE, who wrote for the court, detailed much from the record showing the methods used to stifle competition, to "knock out" all companies which were presumptuous enough to attempt to enter the field which defendant claimed the right to exclusively occupy. There is complete absence in this record of any showing of the use of similar methods. In fact, there is not in this record anything worthy of consideration tending to show any restraint of trade, any monopoly, any trust. The findings of the trial judge are not only supported by the record, but such findings are the only ones which the record would support.

The judgment will stand affirmed.

FEAD, C. J., and NORTH, WIEST, CLARK, McDONALD, and SHARPE, JJ., concurred. POTTER, J., did not sit.