No. 41,348

JOHN I. OKERBERG, JR., *Appellant,* v. ROBERT CRABLE and CARL E. KERSLEY, *Appellees.*

(341 P. 2d 966)

Opinion filed July 10, 1959.

*Basil W. Kelsey,* of Ottawa, argued the cause, and *Winton A. Winter,* of Ottawa, was with him on the briefs for the appellant.

*John C. Gage,* of Kansas City, Mo., argued the cause, and *William S. Bowers,* of Ottawa, was with him on the briefs for the appellees.

The opinion of the court was delivered by

ROBB, J.: This is an appeal from the trial court's final judgment in favor of appellees (defendants), against appellant (plaintiff) and from that court's order overruling plaintiff's motions to modify its findings of fact and conclusions of law and for a new trial.

The petition sought a money judgment of $1,229.50 based on a contract entered into by certain independent milk truck operators (haulers) who transported milk in cans from the farms of producers to the Bennett Creamery Company plant in Ottawa. The contract was captioned:

"MILK ROUTE TERRITORY REGULATIONS COVERING ALL INDEPENDENT MILK TRUCKS DELIVERING MILK FROM PRODUCERS TO THE BENNETT CREAMERY CO., OTTAWA, KANSAS, February 6, 1957."

The contract provided, in substance, that milk routes were to be recognized by number and color, and when routes overlapped roads should be colored to denote route territory on a route map to be kept and locked in a glass case in the haulers' office at Bennett's plant; any route change was to be made by not less than "three committee members" at the request of the haulers desiring the

change and with all affected haulers present; a hauler had to serve all producers in his territory who sold to Bennetts and he would be penalized if he forfeited a producer's business; far-reaching routes would be protected from encroachment by new and nearer routes; (the compensation feature of the contract is covered in the trial court's findings of fact appended hereto). The remaining portion of the contract required the regulations to be signed by all haulers and posted with the route map, indicating their acceptance of both.

The contract and route map were in effect for a number of years (the record does not reflect the exact number) but it has been at least since the 1951 flood because a new route map was made up at that time.

In February, 1957, in order to provide for a more modern and efficient method of hauling milk from refrigerated bulk tanks on producers' farms via a hauler's bulk tank truck to Bennetts, an additional paragraph (item 10) was added to the regulations whereby it was agreed that tank hauling rights could be sold and transferred by a can hauler to a bulk tank hauler under one of two proposed payment plans. The payment plan with which we are here concerned was the first, or cash, payment plan, under which cash was to be paid within thirty days after the first bulk tank hauling and was to be computed at the "minimum rate of 50¢ per lb. average of previous 12 months daily average weight." The average weight was determined by dividing the total pounds of milk produced during the previous twelve months by 365, or if the period was less than twelve months, by dividing the total number of pounds by the number of days shipped. Such sale to a purchasing hauler would be final and binding and without recourse except that if a bulk tank farmer-producer reverted to cans within twelve months, then the territory owner (can hauler) had to refund the pro rata share of the purchase price to the bulk tank hauler. If the change back to cans occurred after a year then no refund was to be made but the bulk tank hauling rights were not thereby lost to the tank hauler or his successor.

Item 10 further provided that if a producer who converted from cans to bulk tank had not sold to Bennetts for more than a year, then no payment was to be made by the tank hauler to the territory owner (the can hauler). Item 10 was to be applied to bulk tank milk and did not affect previous can milk regulations. The regulations went with the territory and bound the successor. The Haulers' Committee would decide any bulk tank question not cov-

ered by item 10. At least ten haulers were required to call a meeting of route owners and a two-thirds majority of all route owners was required to change the regulations. A total of 34 haulers, including appellant and both appellees here, signed the regulations.

The issues were made up and both appellant and the appellees filed requested findings of fact and conclusions of law. The trial court's comprehensive and complete findings and conclusions, as finally amended, are hereto appended and made a part hereof.

Since the trial court's findings are supported by the evidence, they are conclusive on appeal. (*Davis-Wellcome Mortgage Co. v. Long-Bell Lumber Co.*, 184 Kan. 209, 336 P. 2d 469.) We believe that findings No. 11, 12, 18, and 27 substantially contain the theory set out in the suggested additional findings of appellant submitted in connection with his motion to modify the trial court's findings and we do not deem it necessary to discuss this claim of error.

Without repeating, we are of the opinion the last-mentioned findings establish the fact that there was competition between Bennetts and other plants in the territory in question and that there was competition between the signers of the regulations and the haulers for other plants. This competition was active in the territory under consideration here. If the producer did not wish to use the services of the hauler on his territory, he could haul the milk to Bennetts in his own truck but if he wished to use the services, the hauler was compelled to furnish them.

Under the trial court's findings 7 and 8, which refer to federal regulations controlling this particular business, it is apparent why the parties do not make a material issue as to whether the territory regulations affect the price of milk and its by-products to the consumer. It is admitted, and the record shows, that the trial court was not confronted with, nor did it determine, any application or effect of the Federal Anti-Trust Laws and by reason thereof we shall not consider them in this appeal. In other words, this court is committed to the rule that it will not pass upon an issue which has not previously been presented to the court below. (*In re Estate of Cramer*, 183 Kan. 808, 816, 332 P. 2d 554.)

The case was tried and decided by the trial court under two of our "restraint of trade" statutes. G. S. 1949, 50-101 in pertinent part reads:

"A trust is a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, for either, any or all of the following purposes:

"*First.* To create or carry out restrictions in trade or commerce, or aids to commerce, or to carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state.

. . . . . . . . . . .. . . . . . .

"*Third.* To prevent competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities, or to prevent competition in aids to commerce.

"*Fourth.* To fix any standard or figure, whereby its price to the public shall be, in any manner, controlled or established, any article . . . of produce or commerce intended for sale, use or consumption in this state.

"*Fifth.* To make . . . any contract . . . by which they shall bind . . . themselves not to . . . transport any article or commodity . . . of . . . commerce or consumption below a common standard figure; or by which they shall agree . . . to keep the price of such article, commodity or transportation at a fixed or graded figure . . . to preclude a free and unrestricted competition among themselves or others in transportation . . . of any such article or commodity . . . that its price may in any manner be affected. And any such combinations are here declared to be against public policy, unlawful and void."

G. S. 1949, 50-112, in part, provides:

"That all arrangements, contracts . . . which tend to prevent full and free competition in the . . . transportation or sale of articles . . . of domestic growth or product of domestic raw material . . . which tend to advance, reduce or control the price or the cost to the producer or to the consumer . . . are hereby declared to be against public policy, unlawful and void."

In support of their argument that the agreement herein is contrary to public policy, illegal *per se,* and void, appellees rely on a number of our contract cases and we will examine some of them. The agreement in *State v. Smiley,* 65 Kan. 240, 69 Pac. 199, 196 U. S. 447, 25 S. Ct. 289, 49 L. ed. 546, was entered into by all the grain buyers of a certain market for the express purpose of preventing competition among the buyers. It was for the further purpose and effect of pooling the profits of the grain trade and the formation of a grain trust among the buyers. (pp. 264-265.) *State v. Wilson,* 73 Kan. 343, 84 Pac. 737, concerned an agreement among the members of an association, which practically controlled the business at a great commercial center, that they would make no purchases or sales for others without charging as a commission for their services at least 50¢ for each head of cattle handled. This obviously created a restriction in the full and free pursuit of that

business. (p. 348.) In *Mills v. Ordnance Co.*, 113 Kan. 479, 215 Pac. 314, a contract providing for the purchase and sale of tractors with the price fixed at which the purchaser should sell the tractors was held illegal because it was violative of the anti-monopoly statutes of this state. The contract involved in *McGregor v. Bank*, 114 Kan. 356, 219 Pac. 520, related to a settlement between a borrower and a bank and was held to be void because it was unfair and unjust to third persons, namely, creditors of the bank. A secret arrangement was entered into by the plaintiffs in *Gard v. Holmes*, 132 Kan. 443, 295 Pac. 716, whereby Holmes, a mortician in Wichita, was to hire one Schultz, a mortician in Anthony, Kansas, so as to discontinue Schultz as a competitor to the plaintiffs who ran the only other mortuary in Anthony, but examination of that opinion shows a relaxing of the strict rule of the common law and our earlier cases by use of the following language:

"If these plaintiffs had made a fair and open bargain to buy out Schultz' business and had bound him to stay out of the undertaking business in Anthony and thereabout for one year or ten, we would have little hesitation in upholding the contract." (p. 446.)

The contract in *United Artists Corp. v. Mills*, 135 Kan. 655, 11 P. 2d 1025, was declared to be invalid on two grounds but we are concerned with only the one under G. S. 1949, 50-101, *Fifth*, fixing the exhibitors' price for admission at no less than ten cents. The contract in *Patterson v. Glass Co.*, 91 Kan. 201, 137 Pac. 955, was held bad because by it and other similar contracts, the company sought to control the output and price of window-glass factories throughout the country. (p. 205.) This case was later cited in *Joslin v. Steffen Ice & Ice Cream Co.*, 143 Kan. 409, 412, 54 P. 2d 941, wherein plaintiff, a retailer, had to buy all the ice he required from Steffens at thirty cents a hundred weight and sell it at not less than forty cents a hundred weight. This court there said such an agreement resulted in the consumer having "to foot the bill." (p. 411.) A manufacturer may set his price at which he will sell his product but he and his buyer cannot agree as to the price the retailer will charge third parties. (p. 411.)

A more exhaustive discussion of many of the cases cited by appellees appears in *Morrison v. Bandt*, 145 Kan. 942, 67 P. 2d 584, cited and relied upon by appellant. In that case the transaction was void because it sought, by securing title and possession of certain grain elevator property, to control the price of grain and

prevent competition. The rule that must prevail in cases of this character from *McBratney v. Chandler*, 22 Kan. 692, was quoted and followed in the Morrison case. It read:

"'That which is bad destroys that which is good, and they perish together.'" (p. 945.)

The quotation from the McBratney case, as set out in the Morrison case, continued:

"'There is no presumption that a contract is illegal. He who denies his liability under a contract which he admits having made, must make the fact of its illegality apparent. The burden of showing it wrong is on him who seeks to deny his obligation thereon. The presumption is in favor of innocence, and the taint of wrong is [a] matter of defense.'" (p. 945.)

*Pohlman v. Dawson*, 63 Kan. 471, 65 Pac. 689, also cited by appellant, concerned a contract to sell a barber shop wherein the court enjoined the seller from working in a competing barber shop under the agreement made that he "should not engage in the barber business in any manner in Russell, Kan."

An instructor in vocal training sued a pupil for an accounting and for specific performance of their contract and this court reversed the trial court's order sustaining a demurrer to the petition. (*Heckard v. Park*, 164 Kan. 216, 188 P. 2d 926, 175 A. L. R. 605, 617.) Therein is included a full treatment of the authorities cited by appellant here. Consideration and mutuality of the contract were also discussed which settles those questions now before us since, on the one hand, appellant has surrendered his three customers to appellees, and on the other hand, appellees have received them and have enjoyed their business and the income it has produced for them. The Heckard case recognized that no "hard-and-fast" rule governing all such contract cases can be laid down. (p. 223.) This court there held:

"The old rule as to limitations of time and space with respect to contracts involving restraint of trade has given way to the modern doctrine of reasonableness and the real test is never whether there is any restraint but always whether the restraint is reasonable under the facts and circumstances of the particular case." (Syl. ¶ 7.)

In the Heckard opinion, similarly to our present case, the solution of the question of reasonableness of a contract of the character there being considered was said to depend "upon fundamental elements of common fairness in view of the facts and circumstances of the parties." (p. 224.)

Some of the circumstances to be considered in determining the

fundamental elements of common fairness of the regulations in this case are that under finding eleven all of the producers of milk, none of which is a complaining party here, are generally charged the same hauling rates within a particular route territory of a can hauler whether the milk goes to Bennetts or to some other plant and irrespective of the distance from the farm to the receiving plant. Thus the regulations did not work any hardship on the milk producers. On the other hand, the producers had access, if they desired it, to the regular service of a hauler who knew and traveled all types of roads under all weather conditions, with proper equipment, so that the milk was picked up at approximately the same time every day if they used cans, or once every two days if they used the bulk tank system. Without such systematic and orderly regulations there would be overlapping of territories, excessive distances to be covered by haulers, and other circumstances whereby the producers could not be positive that all or any of the milk produced would reach its destination or what its condition would be when it arrived. As we view the regulations, the fundamental elements of common fairness, so far as the milk producers are concerned, are well established.

The appellees through the regulations here being considered have been and now retain their territory as can haulers along with the three customers of appellant they obtained by reason of item 10. Under the reasoning of the Heckard case, this is not inimical to our "restraint of trade" statutes or to public policy.

We cannot agree with the trial court's second conclusion of law that the regulations had the purpose and effect of eliminating competition for the transportation of milk by third parties. So far as Bennetts and the signers of the regulations are concerned, the producers could haul their milk themselves, if they preferred. The entire plan is based on competition, as heretofore stated, and further discussion is unnecessary on this point.

From previous discussion we think that the trial court's findings do not support the third conclusion of law since there is no price-fixing of the milk or requirement that the producer must sell to Bennetts. At no time does the milk become the property of the hauler. Appellees have cited United States v. Nationwide Trailer Rental System, 156 F. Supp. 800, affirmed per curiam, 355 U. S. 10, 78 S. Ct. 11, 2 L. Ed. 2d 20, which is not controlling here because a federal law was there involved. That case shows what appellees

contend and the trial court concluded as to the purpose and effect of these regulations but a careful study of that case shows the distinction between a void agreement, as there, and a valid and reasonable set of regulations such as we have here.

In regard to the fourth conclusion of law, we believe our previous discussion has determined it was not proper and especially is this true on the point of any presumptions. They must be in favor of the validity of the regulations and not the invalidity thereof. The burden at all times was on appellees to prove the invalidity of the regulations.

We believe it will suffice to say in a summary way that while the trial court did not err in refusing to amend its findings of fact, in view of those findings it did err in concluding the regulations were void when they were, in fact, reasonable and valid. The result is the judgment must be reversed. It is so ordered.

## "FINDINGS OF FACT

"1. Plaintiff, John I. Okerberg, Jr., is the owner and operator of Can Milk Route No. 6, delivering milk in cans from a specific territory to the Bennett Creamery Company plant at Ottawa, Kansas.

"2. Defendant, Robert Crable, was on February 2, 1957, the owner and operator of Can Milk Route No. 3 and No. 5, delivering milk in cans from two specific territories to the Bennett Creamery Company plant. Subsequently, in the summer of 1957, Crable sold route No. 3 to Keith Watts. Crable is now the owner and operator of Can Milk Route No. 5.

"3. Defendant, Carl E. Kersley, was on February 2, 1957, the owner and operator of Can Milk Route No. 18, delivering milk in cans from a specific territory to the Bennett Creamery Company plant. Several months later, Kersley sold Route No. 18, moved his permanent residence to Phoenix, Arizona, and was not a milk hauler when the petition herein was filed.

"4. For more than ten years can milk routes coming into Bennetts had been operated under an agreement between the milk haulers. The written agreement in effect prior to February 2, 1957, consisted of all of the provisions of 'Milk Route Territory Regulations Covering All Independent Milk Trucks Delivering Milk From Producers to The Bennett Creamery Company, Ottawa, Kansas,' being Plaintiff's Exhibit 1, except Item 10 thereof. The plaintiff and the defendants were parties to this agreement upon February 2, 1957, and prior thereto.

"5. On all can routes referred to herein as delivering to the Bennett Creamery Company there is and.has been both Grade 'A' and Grade 'C' milk. There are approximately 1400 such producers of which 316 are Grade 'A' and the remainder are Grade 'C' who sell direct to Bennetts. The can milk haulers are required to use covered, insulated, truck beds which are designed to help keep the milk clean and prevent it from becoming too warm.

"6. All Grade 'A' milk, for more than eighteen months prior to and up to October 1, 1957, delivered to the Bennett plant was being purchased by Meyer Sanitary Milk Company, a Kansas corporation, lessee of the Grade 'A' receiving facilities of the plant owned by the Bennett Creamery Company, a Kansas corporation; and from October 1, 1957, to the present time, this Grade 'A' milk has been purchased by Pure Milk Producers Association of Greater Kansas City, Inc., which became lessee of the Grade 'A' receiving facilities of the plant.

"7. Meyer Sanitary Milk Company, and after October 1, 1957, Pure Milk Producers Association, have paid producers for this milk, making deductions from payment to producers for payment of hauling charges and paying the same to haulers. This Grade 'A' milk is normally shipped in bulk from said receiving station to Kansas City for use in bottling, the surplus or excess not required for said use, if any, being sold and transferred to Bennett Creamery Company for manufacturing purposes at a 'Class II' price, established by Federal Milk Marketing Order No. 13, which is approximately equivalent to the price for Grade 'C' milk. The Grade 'C' milk on these routes is sold and delivered to Bennett Creamery Company and processed in the Bennett Creamery Company manufacturing facilities.

"8. Pure Milk Producers Association of Greater Kansas City, Inc., is a cooperative marketing association, whose membership *consist* of Grade 'A' producers selling to handlers in the Greater Kansas City marketing area, as defined by Federal Milk Marketing Order No. 13. It is a bargaining or marketing cooperative, as distinguished from an operating cooperative. Its members are parties to a standard membership and marketing contract between themselves and the Association, whereby the Association has the right to control and direct the marketing of their milk.

"9. The Bennett Creamery Company has had since October 1, 1957, an agreement with Pure Milk Producers Association whereby the Association will cause to be delivered to the leased facilities

at the Bennett plant milk of substantially all of its member can shippers who formerly delivered to Meyer Sanitary either at Bennetts or at the Lawrence receiving station. In practice a few Pure Milk members have transferred from Bennetts to other plants and Pure Milk has permitted such transfers by member producers. As many as 200 of the approximately 1400 producers who sell to Bennetts or through their plant have changed during a year to other plants or from other plants to Bennetts.

"10. Of the Grade 'A' producers delivering to the Pure Milk station at the Bennett plant, 80% to 90% are members of Pure Milk.

"11. Grade 'A' producers may transfer at any time from Bennetts to other plants willing to purchase their milk delivering into Kansas City, Lawrence, Topeka, Emporia or Council Grove, thus transferring their quota within the same Federal Marketing Area without any type of permit, unless they have voluntarily signed away this right to Pure Milk Producers Association and the Association enforces the right of directing the receiving plant to which the producers' milk should go. Such transfers have occurred since this action was filed and solicitations for transfers are going on currently. Hauling rates are generally the same for all producers within a route territory for the can milk routes of Bennetts and others, irrespective of distance from the receiving plant. Producers cannot transfer their marketing quotas to another Federal Order Market such as Wichita, except in the fall of the year.

"12. The plaintiff in the territory around Burlington, Kansas, covered by his Can Route No. 6 had competition for producers of both Grade 'C' and Grade 'A' milk from milk haulers who hauled to other than the Bennett plant. These competing plants included, from time to time: Meadow Gold of Topeka, through their Emporia receiving station, Pet of Iola; the Burlington cheese factory; a Parsons plant; two bottling plants at Emporia and other local smaller dairies. Some competition from plants other than Bennetts for milk from producers exists generally throughout the area served by the Milk Haulers who deliver milk to the Bennett plant. Grade 'A' bottlers, such as the two serving the city of Ottawa, which are not regulated by Federal Order and subject to federal marketing quotas have generally had an adequate and stable supply of milk and have been adding only very few producers.

"13. Since the fall of 1957 a few individual Grade 'A' milk producers in the area surrounding Ottawa have converted from pro-

duction and delivery of milk in cans to production and delivery in bulk. This conversion requires purchase by the producer of a farm bulk tank for the cooling and storing of the milk. It also necessitates the use of an over-the-road bulk tank truck, the milk being pumped from the farmer's tank into the tank truck and delivered in bulk. Conversion to bulk delivery makes possible the production and delivery of a cleaner, higher quality, milk. Some plants are paying a bonus of 10¢ per hundredweight for tank milk for a period of 36 months. It also makes possible greater efficiency and saving in hauling expense to the producer through bulk handling and every-other-day pickup in bulk, whereas can pickups must be made every day.

"14. The volume in the Bennett Creamery Company manufacturing plant is presently about 200,000 pounds per day, during the so-called 'flush season' of the year when volume is at its highest level. The capacity of the Bennett manufacturing plant is approximately 500,000 pounds per day and the ideal volume would be 350,000 to 400,000 pounds each day. The Bennett Creamery Company needs additional milk for manufacturing and has an interest in preventing loss or depletion of its milk supply.

"15. On February 2, 1957, Crable was anticipating the establishment of a bulk tank milk route for the collection of milk in tanks from the territories in which the milk haulers to the Bennett plant operated their various numbered routes including Can Milk Route No. 6 owned by the plaintiff and Can Milk Route No. 18 owned by the defendant, Carl Kersley. He thereafter purchased a truck for $4,000.00; leased a tank from Pure Milk Producers Association; qualified for a sampler's license to take samples, etc., at the farms; and commenced the operation of Pure Milk Route No. 14 on March 1, 1957. Galen Bristow owner of Can Milk Route No. 37, had, prior to February 2, 1957, established a bulk tank route which was designated as Pure Milk Route No. 13. Crable and Bristow collected Grade 'A' milk from the various can route territories from which milk was collected and transported to the Bennett plant by can haulers and transported the same usually to Meyer Sanitary Milk Company at Kansas City, Kansas. However, at the beginning, some tank milk was delivered to the Bennett plant. In the event of a surplus Crable and Bristow could be instructed to divert their loads direct to Bennetts. (See Finding No. 7) Crable's tank was usually filled for the trip to Kansas City by 'Topping it off' at the Bennett plant.

"16. On February 2, 1957, at a called annual meeting of the Milk Haulers Association, a discussion was had concerning the matters later set forth in item 10 of the regulations. The price to be paid by tank haulers to can haulers, upon conversion by a producer from can to tank, was the principal subject. An agreement was made at that meeting by a majority, including the affirmative vote of the plaintiff and the defendants, Robert Crable and Carl Kersley, all of whom were present. This agreement was later reduced to writing by the Route Committee and agreed to by all the route owners by their signing of the new regulations, Plaintiff's Exhibit 1, including all of the parties to this action.

"17. The Bennett Creamery Company did not sign Exhibit 1. The Bennett Creamery Company has through the years and does now acquiesce in the division of the milkshed served by Bennetts into territories by the haulers and the regulations adopted by the haulers; has been represented at milk haulers' meetings; has assisted in the administration of the agreement by the Milk Haulers Association and its Route Committee and has at all times been the custodian of the route map, Plaintiff's Exhibit 2, which is not changed except in the presence of a representative of Bennetts as well as the individual haulers affected by the change. Any change is by agreement between the haulers affected or as determined by the 'Milk Haulers Committee.' Meyers Sanitary Company, prior to October 1, 1957, and Pure Milk Producers Association, since that date, have likewise acquiesced in the haulers' agreement to the extent of deducting the haulers' charge from the proceeds payable to the producer and making payment thereof direct to the hauler.

"18. According to the regulations set out in Plaintiff's Exhibit 1 'all freight on milk hauled to The Bennett Creamery Co., which is produced in a specified territory shown on the (route) map is to be paid to the hauler who owns that territory as shown on the map.' Said regulations have been administered accordingly by the Milk Haulers Association with the consent, cooperation and assistance of The Bennett Creamery Company. Only the milk hauler in whose territory the milk is produced receives freight on the milk hauled by anyone other than the owner from his territory. A producer, if properly equipped, could, if he desired to do so, haul his own milk to Bennetts and the freight charge for the route territory in which the milk was produced would not be deducted from the price of milk so delivered by the producer thereof. A producer electing to sell Grade 'A' or Grade 'C' milk at the Ben-

nett plant is required to use the services of the route owner in whose territory the milk is produced unless he hauls the milk himself.

"19. Under said Regulations, milk haulers were *unable* to and did set the price to producers for the hauling of their milk and raised the price without prior consultation with producers. Producers desiring to deliver their milk to the Bennett plant and to use the services of a hauler were in effect required to deliver on the truck of the hauler 'owning the territory' at the rate specified by that hauler because no other hauler could receive payment for hauling their milk. The acquiescence, cooperation, assistance and participation of Bennetts was present and required in achieving this result, in that deduction from payments to producers and payments of freight to haulers were made at the Bennett plant. The producers' only alternatives were (1) to haul his own milk or (2) to sell somewhere other than through the Bennett plant.

"20. The price paid by Bennett for Grade 'C' milk and the price paid by *Myer* Sanitary and Pure Milk for Grade 'A' milk is determined by federal orders, competition and other factors beyond the control of any of the parties to this action. The agreement between milk haulers, evidenced by Plaintiff's Exhibit 1, affects the amount received for Grade 'A' and Grade 'C' milk delivered to the Bennett plant in that the hauling charge fixed by the hauler, without competition from other Bennett milk haulers, is withheld from the purchase price of the milk.

"21. Under paragraph 10 of the Milk Haulers Regulations, Plaintiff's Exhibit 1, all haulers agree that the bulk or tank hauling rights will be sold for fifty cents (50¢) per pound on the average daily delivery of the producer for the previous twelve months under two plans set forth therein.

"22. The 50¢ per pound payment has been applied by separate agreement to bulk haulers who are neither signers of the regulations nor assignees thereof. For instance, Elvin Dillon agreed to make such payment for can milk converted to bulk and hauled on the tank route operated by him in a written agreement procured at the request of an officer of Bennett Creamery Company. Dillon had previously received a similar payment from 'Bennett' can milk haulers for producers who transferred to the Bennett plant and the Bennett can haulers from four or five can routes then owned by Dillon and previously delivering to the Lawrence-Meyer receiving station.

"23. The Regulations provide that 'the rights and benefits of the Regulations shall pass from a route owner to his successor and go with the territory, therefore, the buyer and seller of a route should consider these potential rights and benefits in negotiating the sale or transfer of a territory.' There have been numerous transfers of routes since February 2, 1957, and many of the persons signing Plaintiff's Exhibit 1 no longer have milk routes to the Bennett plant.

"24. Floyd Isch, can 211, Route 6, converted from a can producer of Grade 'A' milk to a bulk producer and transferred to Pure Milk Route No. 14 on July 15, 1957. The average daily weight of said producer was 1,202 pounds. This amount multiplied by 50¢ per pound amounts to $601.00. During the preceding year, the Grade 'A' milk of producer Isch had been sold and delivered to Meyer Sanitary Milk Company, a Kansas corporation, through the Bennett plant.

"25. Emil Hess, can 1, Route 6, converted from a can producer of Grade 'C' milk to a bulk producer and transferred to Pure Milk Route No. 14 on July 15, 1957. The average daily weight of said producer's milk was 543 pounds for the preceding period of 91 days during which he delivered to the Bennett Creamery Company. This amount multiplied by 50¢ per pound amounts to $271.50. Producer Hess transferred from another plant and did not deliver to the Bennett plant during the preceding year, with the exception of 91 days prior to July 15, 1957.

"26. Alfred Meyer, can 130, Route 6, converted from a can producer of Grade 'A' milk to a bulk producer and transferred to Pure Milk Route No. 14 on August 18, 1957. The average daily weight of said producer's milk was 714 pounds. This amount multiplied by 50¢ per pound amounts to $357.00. Producer Meyer sold and delivered his milk during the preceding year to Meyers Sanitary Milk Company, through the Bennett plant.

"27. Competition exists in Route 6 and the other Bennett milk routes for the collection of Grade 'A' milk in bulk by tank from other haulers and companies. The defendants, Crable and Kersley, could have at all times obtained the conversion of Grade 'A' producers from can producers to tank producers who were and are being served by other haulers and companies competing with the haulers owning routes at The Bennett Creamery plant and competing with Bennetts, *Myers* Sanitary and Pure Milk.

"28. On or about January 6, 1958, Crable sold his truck (purchased in October, 1957, for $4,000.00) and assigned his interest in his tank lease and contract with Pure Milk to defendant Kersley for $6,500.00. Defendant Kersley thereafter moved his permanent residence from Phoenix, Arizona, to Ottawa, Kansas.

"29. Although plaintiff and defendants, as well as all the milk haulers mentioned herein, operate trucks for public use in transporting Grade 'A' and Grade 'C' milk produced by those producers residing in their respective route territories who desire to sell to or through the Bennett plant and therefore appear to be common carriers as defined by Section 66-105 of the statutes of Kansas, there is no evidence that any of the parties have applied for and received a permit from the Kansas Corporation Commission to operate as common carriers. Therefore, the services performed and the rates charged by said parties have not been subject to the supervision and control of the Kansas Corporation Commission."

### "CONCLUSIONS OF LAW

"1. The Milk Haulers Association is an unincorporated association of independent contractors engaged in the hauling of milk for producers desiring to sell milk to or through the Bennett plant. The members of the Milk Haulers Association are not agents or sole agents within the meaning of Section 16-112 of the statutes of Kansas.

"2. The members of the Milk Haulers Association, being the signers of the agreement designated 'Milk Route Territory Regulations Covering All Independent Milk Trucks Delivering Milk From Producers To The Bennett Creamery Co., Ottawa, Kansas,' (Ex. 1), and their assigns, have by said agreement bound themselves to divide the area from which milk is produced and delivered to the Bennett plant into territories and prevent any other member-hauler or other person beside 'the hauler who owns that territory' from receiving freight on milk hauled to the Bennett plant. The effect of this agreement and the operation thereof has been to eliminate competition for the transportation by third parties of milk from the producers desiring to deliver to the Bennett plant to said plant contrary to the following provisions of the statutes of the State of Kansas:

"50-101 which prohibits a combination of the acts of two or more persons for the following purposes:

"First, to create or carry out restrictions in aids to commerce, or to carry out restrictions in the full and free pursuit of any business.

"Third, to prevent competition in the transportation of merchandise, produce or commodities, or to prevent competition in aids to commerce.

"Fifth, to pool, combine or unite any interest they may have in connection with the sale or transportation of any article or commodity, that its price may in any manner be affected.

"50-112 which prohibits all agreements between persons or corporations made with a view or which tend to prevent full and free competition in the transportation of articles of domestic growth and all such agreements designed or which tend to reduce or control the price or the cost to the producer of any products or any other services (in this case transportation).

"3. Such an agreement which is contrary to the public policy of the State of Kansas as defined by the legislature in the statutes referred to above is by the provisions of Section 50-107 of the statutes of Kansas not enforceable in any of the courts of this state. Judgment will therefore be entered for the defendants.

"4. Although there was no direct evidence to establish that hauling rates would be less if the milk haulers agreement (Ex. 1) were not in effect, such an agreement being contrary to the declared public policy of the state is presumed to be injurious to the public welfare."