McDILL v McDONALD COOPERATIVE DAIRY COMPANY

JACKSON v McDONALD COOPERATIVE DAIRY COMPANY

BONE v McDONALD COOPERATIVE DAIRY COMPANY

Docket Nos. 77-2871, 77-2872, 77-2873. Submitted May 3, 1979, at Lansing.—Decided August 7, 1979. Leave to appeal applied for.

Plaintiffs, Duane H. McDill, Richard L. Jackson and Everett W. Bone, are haulers of milk from producers' farms to dairies. Defendant, McDonald Cooperative Dairy Company, is a cooperative dairy owned by the producers who sell to it. Plaintiffs own their own trucks and are independent contractors vis-à-vis defendant, collecting and hauling milk over fixed routes on a regular schedule. Plaintiffs' routes are regarded as assets by the haulers and were acquired by purchase by each hauler. Plaintiffs each sued defendant for damages alleging that the routes were contractually exclusive and that defendant breached the contract by accepting milk produced within the plaintiffs' exclusive territories and hauled by outside haulers without insisting that the outside haulers negotiate settlements with plaintiffs. The cases were consolidated for trial. The jury found for the plaintiffs and awarded damages, but the Genesee Circuit Court, Philip C. Elliott, J., granted a judgment *n.o.v.* for defendant, holding that the contract upon which plaintiffs relied was an illegal restraint of transportation of goods in trade. The court further held that, in the event its holding was overturned on appeal, defendant would be entitled to retry the issue of damages because the verdicts were not supported by the evidence and were influenced by anticorporation prejudice. Plaintiffs appeal. *Held:*

1. The contract should be judged for illegality by the rule of reason and is reasonable, not in violation of the Michigan antitrust statutes.

2. While the amount of the verdicts was improper, the record

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 54 Monopolies, Restraints of Trade and Unfair Trade Practices §§ 196, 488.

[3] 5 Am Jur 2d, Appeal And Error § 940.

22 Am Jur 2d, Damages § 366.

contained a prima facie showing of loss in an identifiable amount. In such a situation the claimants should have the choice to accept the damages as determined by the jury, less remittiturs, or retry the issue.

Reversed and remanded.

1. Monopolies — Statutes — Illegal Contract — Rule of Reason.

A contract between milk haulers and a cooperative dairy, owned by the milk producers, whereby the cooperative granted each hauler an exclusive right to haul to its plant milk from producers in the geographical area defined by his route must be judged, for illegality under the antitrust act, by the rule of reason (MCL 445.701; MSA 28.31).

2. Monopolies — Restraint of Trade.

A contract between milk haulers and a cooperative dairy, owned by the milk producers, whereby the cooperative granted each hauler an exclusive right to haul to its plant milk from producers in the geographical area defined by his route does not violate the Michigan statutes relating to monopolies and restraint where the exclusivity of territories has not been manipulated to extract inflated fees from producers and is, in fact, the most economical means of organizing milk hauling.

3. Appeal and Error — Excessive Damages — Remittitur — Court Rules.

To the end that litigation may be expeditiously terminated and retrials avoided it is desirable, when the only ground for reversal of an action for damages is that an excessive amount was awarded by the jury, that the plaintiff be afforded an opportunity for affirmance upon remittitur of a specified amount (GCR 1963, 820.1[7]).

*Dean A. Polzin Law Offices* (by *Robert A. Kaminski),* for plaintiffs.

*Cline, Cline & Griffin,* for defendant.

Before: M. F. Cavanagh, P.J., and R. M. Maher and W. Van Valkenburg,* JJ.

Per Curiam. The plaintiffs in this action are

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

haulers who transport raw milk from producers' farms to dairies for processing and distribution. The defendant is a cooperative dairy. Each producer who sells milk to the defendant enters a "marketing agreement" and acquires one share of the defendant's stock at a nominal price. The defendant corporation is operated by elected directors and officers and a professional staff.

The haulers own their trucks and are independent contractors vis-à-vis the defendant. They collect and haul milk over fixed routes on a regular schedule and regard their routes as valuable assets capable of barter and sale like franchises; each of the plaintiffs acquired his route, in whole or piecemeal, for a substantial price.

The haulers' routes may be viewed in at least two ways. While each route consists minimally of a series of stops at producers' farms, the routes seldom if ever overlap and may alternatively be regarded as covering distinct geographical areas. The routes are separated only from the routes of other haulers servicing the defendant's plants; the haulers (and presumably the defendant) compete vigorously with other haulers (and with other dairies) for the business of producers within the haulers' geographical ranges. The haulers' charges are paid with funds deducted from the price paid the member producers by the defendant for their milk.

The marketing agreement and the defendant's by-laws outline the procedures by which the member producers participate in the fixing of the rate at which the haulers are paid.

It was the plaintiffs' claim that by conduct, oral expressions and reliance over a number of years there had come into existence a contract between the plaintiffs and the defendant by which the

defendant granted each hauler an exclusive right to haul to its plants milk from producers in the geographical area defined by his route.[1]

The defendant expanded its operations during the 1950's and 1960's by acquiring smaller dairies but the affected producers and haulers apparently were incorporated into the existing supply system without significant difficulty. Around 1973 the Miller Road Dairy, a local Flint operation, went out of business. Most of the milk that had been going to Miller Road was diverted to Detroit. However, one of the Miller Road haulers, Joe Glass, began hauling the milk collected from the producers on his Miller Road route to defendant's plants. Glass's producers were located in plaintiff McDill's territory, their farms interspersed with those served by McDill. McDill asked the defendnat to enforce his exclusive hauling rights in that area, and the defendant refused.

At about the same time, a similar situation developed in plaintiff Bone's territory. Independent Dairyman's Cooperative of Imlay City marketed milk produced by its members to a number of different dairies. Eventually, the last of Independent's usual customers, Twin Pines Dairy, stopped buying Independent's milk. When defendant agreed to accept the milk formerly delivered to Twin Pines, Independent's milk haulers kept their already existing routes; only the final destination was different. Six of these haulers operated routes lying within the area that Bone regarded as his territory. Bone's insistence that these new haulers were violating his territorial rights prompted defendant's president to announce at a milk haulers'

[1] At trial and on appeal the parties have referred to the contractual undertakings involved in the action in both the singular and the plural. Rather than bringing that ambiguity into this opinion, we elect to employ the singular.

meeting that the haulers did not have exclusive territories. From the plaintiffs' point of view, this announcement capped a breach of contract which had begun when the defendant had agreed to accept milk from these "outside" haulers without at least insisting that the interlopers negotiate some sort of settlement with the plaintiffs.

To the plaintiffs' claim of breach of contract, the defendant raised as an affirmative defense the contention that the exclusive territory contract alleged by the plaintiffs constituted an illegal restraint of trade and was therefore unenforceable. The parties agreed to submit the illegality defense to the trial court rather than to the jury. The jury found for the plaintiffs and awarded damages to each.[2]

The trial court granted the defendant's motion for judgment *n.o.v.,* holding that the contract upon which the plaintiffs had recovered was an "illegal [restraint] of transportation of goods in trade". The court also held that, in the event its holding was overturned on appeal, the defendant was entitled to retry the issue of damages because the verdicts were not supported by the evidence and were influenced by anticorporation prejudice.

We address first the holding that the contract in question constituted an illegal restraint of trade.

The defense of illegality is based upon MCL 445.701; MSA 28.31, which declares in pertinent part:

"Sec. 1. That a trust is a combination of capital, skill

---

[2] The defendant, while tacitly insisting in its brief that there was no contract between the plaintiffs and itself, has not preserved for appeal any claim to this effect. Indeed, the defendant admits that the existence of the contract alleged by the plaintiffs was a properly framed question of fact for the jury. See *Groth v DeGrandchamp,* 71 Mich App 439; 248 NW2d 576 (1976).

or arts by two or more persons, firms, partnerships, corporations or associations of persons, or of any two or more of them, for either, any or all of the following purposes:

"1. To create or carry out restrictions in trade or commerce;

\* \* \*

"3. To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity;

\* \* \*

"5. \* \* \* Every such trust as is defined herein is declared to be unlawful, against public policy and void \* \* \*."

The defendant also enlists the assistance of MCL 445.762; MSA 28.62:

"All combinations of persons, co-partnerships, or corporations made and entered into for the purpose and with the intent of establishing and maintaining or of attempting to establish and maintain a monopoly of any trade, pursuit, avocation, profession or business, are hereby declared to be against public policy and illegal and void."

Antitrust legislation began in the late 19th century as a response to the ingenuity and ruthlessness which some entrepreneurs exhibited in controlling markets and eliminating competition. Leading the way was the Sherman Antitrust Act, 15 USC 1 *et seq.,* which prohibited certain combinations in restraint of trade. The Michigan statutes are patterned after that act.

The potentially devastating impact these new statutes could have made on legitimate business practices was avoided when the Supreme Court of the United States, in *Standard Oil Co of New Jersey v United States,* 221 US 1; 31 S Ct

502; 55 L Ed 619 (1911), adopted that which has come to be known as the "rule of reason". One of the best known explanations of this rule can be found in *Board of Trade of Chicago v United States,* 246 US 231, 238; 38 S Ct 242; 62 L Ed 683 (1918):

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

This rule was adopted by the Michigan Supreme Court in *People ex rel Attorney General v Detroit Asphalt Paving Co,* 244 Mich 119; 221 NW 122 (1928).

Further, that Court in *Staebler-Kempf Oil Co v Mac's Auto Mart, Inc,* 329 Mich 351, 356-357; 45 NW2d 316 (1951), said, "[i]t has long been held that a contract would not be construed as in restraint of trade unless the restraint was unreasonable". See also *Barrows v Grand Rapids Real Estate Board,* 51 Mich App 75; 214 NW2d 532 (1974).

Some business practices create such a great probability of injury to free competition that the

rule of reason need not be applied on a case by case basis. In *United States v Topco Associates, Inc,* 405 US 596, 608; 92 S Ct 1126; 31 L Ed 2d 515 (1972), the Court stated:

"One of the classic examples of a *per se* violation * * * is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a 'horizontal' restraint, in contradistinction to combinations of persons at different levels of the market structure, *e.g.,* manufacturers and distributors, which are termed 'vertical' restraints. This Court has reiterated time and time again that '[h]orizontal territorial limitations * * * are naked restraints of trade with no purpose except stifling of competition.' "

It was held in *United States v Arnold, Schwinn & Co,* 388 US 365; 87 S Ct 1856; 18 L Ed 2d 1249 (1967), that vertically imposed territorial restraints were per se violations unless the manufacturer retained such title and dominion with respect to the product that the dealer was in effect only an agent or salesman of the manufacturer. However, this rule was abandoned in *Continental TV, Inc v GTE Sylvania Inc,* 433 US 36; 97 S Ct 2549; 53 L Ed 2d 568 (1977).

It thus appears that while "horizontal" territorial restrictions are per se illegal, "vertical" agreements to the same end are to be subjected to the review of the rule of reason.[3] We apply that rule to the contract at issue in this appeal.[4]

---

[3] The research of the parties and this Court has disclosed no case in which there has been alleged a vertically imposed restraint in the supply of raw materials to a manufacturer; in this case the usual "vertical" *distribution* agreement stands on its head. However, there is no indication that the economics of this situation are not susceptible to analysis under the rule of reason.

[4] The defendant urges in its brief that the only agreement presented by this case is a "horizontal" one among the plaintiffs and

Under the antitrust laws, market conduct is measured by its effect upon competition. The rule of reason compares the condition of the market before and after the claimed restraint and attempts to measure its probable effect upon the functioning of the otherwise free market.

The market in which the plaintiffs and defendant participate remains a competitive one; one of the defendant's witnesses stated,

"In this type of business, you have got to understand that you have got competition and you want to keep the farmers in the business. A lot of farmers are dropping by the wayside."

The evidence shows substantial interbrand (processor) competition. This implies competition between haulers as well.

The haulers receive for their services only a few cents more per hundredweight than they did in 1957, when bulk hauling was introduced. Thus, the exclusivity of territories involved in the case at bar has not been manipulated to extract inflated fees from producers.

The fact that the defendant is a cooperative is itself a guard against market abuse. The majority of the defendant's board of directors is comprised of member producers; it is unlikely that such a "consumer" controlled entity would subject the "consumer" producers to ill treatment through the device of exclusive territories.

The president of the defendant testified that the exclusive territory arrangement was the most eco-

other haulers and is therefore per se illegal. If this were true, the defendant would not be a party to this action and the jury would not have found for the plaintiffs on their asserted contract with the defendant. The contract the defendant claims to be illegal is the "vertical" one between itself and the plaintiffs.

nomical means of organizing milk hauling. We also note that a stable supply system is extremely important in the economical operation of the dairy. Any device which promotes that goal and is at the same time the most economical means available to transport the milk from the producer to the dairy seems eminently reasonable.[5]

Our review of the market effects of the arrangement between the plaintiffs and the defendant convinces us that it was a reasonable agreement, not destructive of competition but effectively controlled by it. As this Court has noted, our statutes are aimed at agreements of such characteristics and scale as to pose legitimate and serious threats of monopoly. *Bobenal Investment, Inc v Giant Supermarkets, Inc,* 79 Mich App 31, 47; 260 NW2d 915 (1977).

We next address the determination of the trial court that the amounts of the verdicts were not supported by the evidence adduced at trial.

The jury was instructed that if it found that the defendant had breached the territorial agreement, the plaintiffs could recover both lost profits and the reduction in the value of their routes. The record must be examined to determine whether the evidence can support the amount awarded each plaintiff without resort to undue speculation. The verdicts must stand if the evidence is adequate.

Plaintiff McDill presented no evidence concerning lost profits; his verdict of $48,000 must be supported solely with evidence of injury to the present value of his route. $48,000 is the price he

---

[5] A concededly horizontal agreement to divide territories among milk haulers was upheld under a statute similar to the Michigan act. In *Okerberg v Crable,* 185 Kan 211; 341 P2d 966 (1959), the Kansas Supreme Court emphasized the fairness of the agreement to producers and the existence of competition with haulers for other processors. Both of these situations obtain in the case at bar.

paid for his route and his testimony was that, in the absence of the exclusive territory agreement, the value of the route had decreased by $38,000. Thus, the verdict is $10,000 greater than the figure supported by the evidence most favorable to McDill.

Plaintiff Jackson stated that he feared that the defendant's repudiation of the territorial arrangement would induce other haulers to invade his territory. At the time of trial, however, this danger had not materialized; a judgment on such vague apprehension would be unduly speculative. Like the verdict for plaintiff McDill, the verdict for plaintiff Jackson must be found to be supported by the evidence showing a reduction in the value of Jackson's route.

Plaintiff Jackson bargained for and purchased part of his route in 1974, after the defendant rejected the territorial arrangement. Thus only the loss of value of the first portion of the route, purchased in 1969, may be calculated in support of the verdict for this plaintiff. The jury awarded Jackson $29,000, an amount apparently intended to equal the $29,038.20 he paid for the 1969 route. The evidence does not show a total loss of value; rather, Jackson's testimony as to the size of the two parts of his routes and their present combined value supports a maximum loss of only $15,038.20, 13,961.80 less than the jury's award.[6]

---

[6] Plaintiff Jackson's 1969 purchase allotted $29,038.20 to the route and the rest of the price to equipment. At the time of trial, Jackson stated, his two routes had a value equal to approximately $24,000 or $26,000 less than their combined purchase price of $50,000. The 1969 route produced 35,000 pounds of haulage per day; the daily volume of the 1974 route was 25,000 pounds. Thus 35,000 ÷ 60,000 or 7/12, of the volume and, logically, the value of the multiple route was attributable to that portion purchased in 1969. Seven twelfths of the minimum retained value supported by the testimony ($24,000) is $14,000. This amount subtracted from the price of $29,038.20 yields the largest loss allowable under the evidence.

The evidence supporting the $76,000 award to plaintiff Bone is the most troublesome. As did the evidence presented on behalf of the other plaintiffs, the evidence adduced to illustrate lost profits fails to reach that level of certainty upon which an acceptable verdict may be based. The jury's verdict was apparently intended to equal the $76,500 Bone paid for his four routes. However, despite the many factors which could influence the present value of the route, the evidence most favorable to Bone shows not a total loss of value but a reduction of value to $10,000. Thus, the verdict exceeds the evidentiary support by $9,500.[7]

The trial court correctly found fault with the amounts of the jury's verdicts. However, the record was not so devoid of support for damage awards as the court believed. Each plaintiff made a prima facie showing of loss of the value of his route as a result of the defendant's abandonment of the system of exclusive territories, but the verdicts exceeded the amounts shown by the evidence. The case thus presents a situation appropriate for *remittitur*. GCR 1963, 820.1(7); *Hartough v Safeway Lines, Inc (On Rehearing)*, 288 Mich 703; 288 NW 307 (1939).

---

[7] Plaintiff Bone purchased four routes between 1951 and 1970, for which he paid a total of $76,500, exclusive of equipment. His daily haulage of 70,000 pounds had fallen to 30,000 pounds at the time of trial; however, a significant factor in this drop was new Federal regulatory activity which encouraged producers to ship via other haulers to Detroit. The addition of the Twin Pines supplies to the defendant's operation brought some "interlopers" into Bone's territory. He was negotiating with them, apparently with success, to restore his daily volume of 70,000 pounds when the defendant's rejection of the exclusive territory principle caused the others to break off. His testimony that his route was presently worth $10,000 may reasonably be interpreted to refer to the route at its prior volume, the volume which he apparently would have reattained through negotiation with the former Twin Pines haulers. Thus, the residual value of $10,000 must be subtracted from the prior value in assessing Bone's injury.

Accordingly, the plaintiffs shall have the choice of participating in a new trial limited to the amount of their damages or remitting the following amounts: McDill, $10,000; Jackson, $13,961.80; Bone, $9,500.

Reversed and remanded for proceedings not inconsistent with this opinion.