MICHIGAN ASSOCIATION OF PSYCHOTHERAPY CLINICS v
BLUE CROSS & BLUE SHIELD OF MICHIGAN (AFTER REMAND)

MIDWEST MENTAL HEALTH CLINIC, PC v BLUE CROSS & BLUE
SHIELD OF MICHIGAN (AFTER REMAND)

Docket Nos. 45750, 45751. Submitted May 19, 1980, at Detroit.—
Decided August 23, 1982. Leave to appeal applied for.

Blue Cross and Blue Shield of Michigan has, for several years,
reimbursed outpatient psychiatric clinics for treatment pro-
vided to subscribers. The reimbursement is made pursuant to
participation agreements entered into with the clinics. In 1979,
Blue Cross notified those clinics of a modification in its reim-
bursement rate structure and indicated that the new rates
would be effected by terminating the existing participation
agreements pursuant to a 60-day termination clause contained
in the agreements and by entering into new agreements con-
taining the new rates. The Michigan Association of Psychother-
apy Clinics and several others, the Midwest Mental Health
Clinics, P.C., brought actions against Blue Cross seeking injunc-
tive relief. The cases were consolidated and the Oakland Circuit

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 702.
[2] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
    Practices §§ 3, 20, 30.
[3] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
    Practices §§ 32, 327.
[4] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
    Practices §§ 31-33.
[5] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
    Practices §§ 30-33, 45.
[6] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
    Practices § 27.
[7, 8] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair
    Trade Practices § 20.
[9] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
    Practices § 340.
[10] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
    Practices §§ 30, 340.
[11] 73 Am Jur 2d, Statutes §§ 100, 281.
[12] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 26 *et
    seq.*

Court, James S. Thorburn, J., permanently enjoined Blue Cross from enforcing the new rate structures and ordered the continuation of the existing participation agreements, holding that the new agreements were in violation of federal antitrust laws. Blue Cross appealed, alleging that the trial court was without jurisdiction to decide whether the agreements violated the federal laws and that the trial court erred by holding that the agreements invade the physician-patient relationship and by finding the 60-day termination clause of the existing agreements to be unreasonable. The Court of Appeals held that the trial court was not without jurisdiction to pass upon the antitrust violation question, that the trial court failed to state on the record the facts upon which it based its holding that the new agreements violated the federal antitrust laws, that the new agreements do not invade the physician-patient relationship, and that the 60-day termination provision of the existing agreements is not unreasonable. The Court then remanded for findings of fact upon which the trial court based its holding that the new agreements violated the federal antitrust laws, 101 Mich App 559 (1980). Following receipt of the trial court's findings of fact after remand, now *held:*

1. The *trial court clearly erred in finding that defendant had* violated federal antitrust law. The court did not find any concerted action between defendant and any other party that resulted in a contract, combination, or conspiracy in restraint of trade or to fix prices, as is required before a violation of the applicable section of the Sherman Antitrust Act can be found. Therefore, the Sherman Antitrust Act is not applicable to the participation agreement proposed by defendant to the clinics.

2. Because there was no evidence that defendant acted or combined with any other entity or person to create or carry out a restraint of trade or to fix prices, the Michigan antitrust statute does not apply to this case.

3. The proposed agreement did not restrain trade or fix prices.

4. The antitrust laws are not violated by the fact that defendant wants to restrict reimbursement to those services provided by therapists with certain educational qualifications. This policy is reasonable and does not consitute a restraint on trade.

5. Defendant has not fixed prices in violation of the antitrust laws. The trial court clearly erred in determining that a graduated rate schedule was arbitrary since there was a reasonable basis for changing from one rate for all therapists to graduated rates based on the therapist's qualifications. There

was no basis for the trial court's finding that defendant had fixed rates in violation of the antitrust laws. The trial court also clearly erred in finding that defendant violated the antitrust laws by fixing a set fee for reimbursement and preventing clinics from charging either over or under that set fee. The clinics are free to charge the public whatever they want and defendant has no control over that.

Reversed.

1. APPEAL — FINDINGS OF FACT — COURT RULES.

An appellate court will set aside a trial court's findings of fact only when those findings are clearly erroneous; a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made (GCR 1963, 517.1).

2. MONOPOLIES — ANTITRUST — SHERMAN ANTITRUST ACT.

The Sherman Antitrust Act declares that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is illegal; in order to find a violation of this part of the act, the following must be established: (1) there must be a contract, combination, or conspiracy; (2) the contract, combination, or conspiracy must be in restraint of interstate or foreign trade and commerce; and (3) the contract, combination, or conspiracy in restraint of trade must be an undue restraint of competition to amount to a restraint of trade (15 USC 1).

3. MONOPOLIES — ANTITRUST — PER SE RULE.

An antitrust violation may be per se illegal, but the rule of per se illegality is only applicable to those cases which exhibit severe restraints of trade with little or no public benefit.

4. MONOPOLIES — ANTITRUST — RULE OF REASON.

The "rule of reason" applies in antitrust cases where there is no per se violation of the antitrust statute; under the "rule of reason", the court determines whether the facts, when weighed by the court in the light of reason, reveal either a forbidden undue effect upon trade or an intent so unduly to affect it.

5. MONOPOLIES — ANTITRUST — SHERMAN ANTITRUST ACT.

Unilateral conduct cannot violate the section of the Sherman Antitrust Act which declares that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is illegal; the act requires the existence of two or more

persons acting in concert in order for the section to apply to any given transaction, and it is not enough to show that two parties merely exchanged information; there must be some evidence of a two-party relationship acting to restrain trade or fix prices (15 USC 1).

6. MONOPOLIES — ANTITRUST — SHERMAN ANTITRUST ACT.

The section of the Sherman Antitrust Act which declares that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is illegal does not prohibit a business entity which needs information and advice from obtaining such information and advice from other knowledgeable business entities; consultation with other groups does not necessarily indicate a contract, combination, or conspiracy between those groups to restrain trade or fix prices, and a decision to implement a policy that coincides with a position taken by the group conferred with does not alone indicate that a contract, combination, or conspiracy has taken place or that the decision was not an independent one, and an independent business decision does not form the basis of a contract, combination, or conspiracy in restraint of trade or to fix prices (15 USC 1).

7. MONOPOLIES — ANTITRUST — SHERMAN ANTITRUST ACT.

The Sherman Antitrust Act is not intended to reach normal and usual contracts which further legitimate trade, nor is it intended to inhibit the intelligent conducting of business operations (15 USC 1 *et seq.*).

8. MONOPOLIES — BUSINESS DECISIONS.

A business may unilaterally choose those with which it will conduct business and upon what terms.

9. MONOPOLIES — ANTITRUST.

Plaintiffs in an antitrust action need to prove the existence of a trust or combination and that defendant belonged to it, or acted for or in connection with it.

10. MONOPOLIES — ANTITRUST.

The legality of an agreement or regulation restraining trade does not depend upon whether or not it restrains competition; the true test is whether the restraint imposed is such as merely regulates, and perhaps thereby promotes, competition or whether it is such as may suppress or even destroy competition.

11. Health — Health Care Professionals.
   The purpose of the statutes regulating health care professionals is to safeguard the public health and protect the public from incompetence, deception, and fraud.

12. Health — Psychology — Police Power.
   The practice of psychology is a privilege which may be licensed by the state pursuant to its police powers.

*Goodenough, Smith & May* (by *Delmer C. Gowing, III),* for Michigan Association of Psychotherapy Clinics.

*Bushnell, Gage, Doctoroff, Reizen & Byington* (by *Noel A. Gage, Mark E. Reizen* and *Lynn H. Shecter),* for Midwest Mental Health Clinic, P.C.

*Michael T. Zajac,* for Blue Cross and Blue Shield of Michigan.

AFTER REMAND

Before: D. E. HOLBROOK, JR., P.J., and V. J. BRENNAN and S. EVERETT,* JJ.

V. J. BRENNAN, J. This case is before us after remand to the trial court for findings of facts as to how the substitute participation agreement between plaintiffs, outpatient psychotherapy clinics (clinics), and defendant, Blue Cross and Blue Shield of Michigan (BCBSM), would restrain trade and fix prices in violation of antitrust laws. *Michigan Ass'n of Psychotherapy Clinics v Blue Cross & Blue Shield of Michigan,* 101 Mich App 559, 568-

* Circuit judge, sitting on the Court of Appeals by assignment.

571; 301 NW2d 33 (1980).[1] Our previous opinion set forth the facts involved in this controversy:

"Since 1966, defendant has offered its subscribers outpatient psychiatric benefits. This has led to increased demand for treatment and a concomitant increase in the number of outpatient psychotherapy clinics. In order for outpatient psychotherapy clinics to be eligible for reimbursement for services rendered to patients insured by defendant Blue Cross and Blue Shield, these clinics must be approved by Blue Cross and Blue Shield. Plaintiffs Midwest Mental Health Clinic and the member clinics of Michigan Association of Psychotherapy Clinics were such approved clinics.

"Originally, defendant reimbursed psychiatrists, psychologists, social workers and other professionals at an average rate of $40 per treatment session. On February 23, 1979, Blue Cross and Blue Shield notified its participating clinics of modifications to its reimbursement policy to take effect May 1, 1979. This modification was to be effected by invoking a 60-day termination at will provision in defendant's participation agreements with the 98 clinics, and by offering the clinics new participation agreements. Under the new agreements, the single rate structure would be replaced by a differential rate structure. Reimbursement would continue until December 31, 1979, for treatment begun before February 26, 1979." 101 Mich App 559, 562-563. (Footnotes omitted.)

To the above facts, we would add that, under the new agreement, BCBSM would no longer reimburse for treatment performed by certain persons who had been treating BCBSM subscribers as qualified therapists under the old agreement. Reimbursement would be limited to psychiatrists, licensed psychologists, social workers with master's

[1] Some of the matters involved in this lawsuit are now addressed in the Nonprofit Health Care Corporation Reform Act, MCL 550.1101 *et seq.;* MSA 24.660(101) *et seq.,* which became effective on April 3, 1981, and which governs contracts between a health care corporation and a professional health care provider.

degrees, and limited licensed psychologists. Those who had been rendering treatment, but who would no longer be reimbursed, included a registered nurse who claimed to have practiced in the area of psychotherapy or counselling for 25 years, a person with a doctoral degree in education who claimed to have practiced in the area of psychotherapy or counselling for 25 years, and others who had master's degrees in fields related to social work.

The trial court's findings regarding restraint of trade and price-fixing are as follows:

"73. On September 29, 1977, BCBSM placed a formal moratorium on contracting with any new OPC facilities. (Defendant's Exhibit D, Plaintiffs' Exhibit 9.)

"74. BCBSM admitted an increase in facilities and an increase in dollar payout of 50% per year. (Exhibit D.)

"75. The court finds as a fact that these increases of facilities and dollar payout reflect an increase in utilization.

"76. That this court further finds that the facts establishing restraint on trade resulting from the moratorium make clear the fact that both the Michigan antitrust and federal antitrust laws have been violated. In this regard, this court wishes to stress that the issue of federal antitrust implication was first raised by counsel for BCBSM and was decided by this court with the consent of both parties.

"77. That the court further finds that the moratorium forced upon the plaintiff clinics as well as other mental health care professionals in southeastern Michigan is anticompetitive in that it creates a situation which freezes out certain mental health care professionals without regard to their qualifications and without any correlating benefit to the general public, and this court finds that the anticompetitive effect far outweighs any cost containment goals claimed by BCBSM.

"78. That the proposed contract sets diverse rates for psychotherapy among the various types of professionals,

*i.e.,* psychiatrists, psychologists and social workers with a Masters Degree in social work for identical service based solely on education and without regard to the experience of each individual therapist in the practice of psychotherapy. (Paragraphs 31 and 32 of stipulated complaint and Exhibit 8.)

"79. Further, this court finds that this unilateral disqualification of certain individuals by the May 1, 1979 contract for reimbursement based strictly on the type of educational qualification of that person, disregarding the individual's experience in the field of psychotherapy, is anticompetitive in nature without any correlating benefit to the general public and in fact is detrimental to the general public who should continue to be entitled to reimbursement for services rendered by qualified psychotherapists regardless of the particular degree that person might hold.

"80. That BCBSM has admitted entering into the May 1, 1979 contract with approximately 200 other clinics which contracts include the diverse reimbursement schedule for identical services of psychotherapy among the psychiatrist, psychologists and social worker.

"81. The court finds as a fact that a fixing of a set fee by BCBSM for reimbursement preventing clinics from charging either over or under that set fee for non-BCBSM patients although not a per se violation of antitrust law falls under the rule of reason as a violation of state and federal antitrust law for the reason that there is no correlating benefit resulting from the restriction imposed by BCBSM on the clinics not to charge the general public less than the amount it charges to BCBSM patients.

"82. Further, this court finds that there is no reasonable benefit to the general public and in particular BCBSM subscribers for the three-rate structure arbitrarily and unilaterally set by BCBSM to reimburse therapists for identical services based solely on their educational qualifications and disregarding their experience in the field."

Further, the trial court stated the following

regarding a violation of the Michigan antitrust statute:

"64. That plaintiffs' complaint was grounded *inter alia* on Michigan antitrust laws MCL 445.701 *et seq.*

"65. That implicit in this court's determination that the May 1, 1979 contract is a violation of the Sherman Act is the finding that the contract is a violation of Michigan antitrust laws for the reason that Michigan antitrust laws are patterned after the federal antitrust laws. See *McDill v McDonald Co-op Dairy Co,* 91 Mich App 611 [283 NW2d 819] (1979). Further, the proofs required for violation of Michigan antitrust laws are viturally *[sic]* identical to those required for proof of violation of federal antitrust laws."

An appellate court will set aside the trial court's findings of fact only when those findings are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. GCR 1963, 517.1. *Birkenshaw v Detroit,* 110 Mich App 500; 313 NW2d 334 (1981).

The trial court found that BCBSM had violated federal antitrust law, the Sherman Act, 15 USC 1, which states in part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal:"

The following must be established in order to find a violation of the above section: (1) there must be a contract, combination, or conspiracy; (2) the contract, combination, or conspiracy must be in restraint of interstate or foreign trade and commerce; and (3) the contract, combination, or con-

spiracy in restraint of trade must be an undue restraint of competition to amount to a restraint of trade. *Appalachian Coals v United States,* 288 US 344, 360; 53 S Ct 471; 77 L Ed 825 (1933). An antitrust violation may be per se illegal. However, the rule of per se illegality is only applicable to those cases which exhibit severe restraints of trade with little or no public benefit. See *United States v Socony-Vacuum Oil Co,* 310 US 150; 60 S Ct 811; 84 L Ed 1129 (1940), *Fashion Originators' Guild of America v Federal Trade Comm,* 312 US 457; 61 S Ct 703; 85 L Ed 949 (1941). If there is no per se violation of the statute, the court applies the "rule of reason" and determines in each case whether the facts, when weighed by the court in the light of reason, reveal either a forbidden undue effect upon trade or an intent so unduly to affect it. *Standard Oil Co of New Jersey v United States,* 221 US 1; 31 S Ct 502; 55 L Ed 619 (1911).

After careful review, we find that the trial court clearly erred.

The Sherman Act, 15 USC 1, requires the existence of two persons acting in concert in order for the section to apply to any given transaction. It is not enough to show that two parties merely exchanged information. *Kreuzer v American Academy of Periodontology,* 516 F Supp 1034, 1038 (D DC, 1981). In the case of allegations that a single organization has restrained trade, the courts have been liberal in finding some concerted action, *i.e.,* with an outside party, among members of the organization, or between subsidiaries. *Aaron E Levine & Co, Inc v Calkraft Paper Co,* 429 F Supp 1039 (ED Mich, 1976). However, to find a violation of § 1 of the Sherman Act, there must be some evidence of a two-party relationship acting to restrain trade or fix prices. Unilateral conduct can-

not violate § 1 of the Sherman Act. *United States v Standard Oil Co,* 316 F2d 884 (CA 7, 1963).

In the present case, the trial court found that it was the proposed agreement itself that restrained trade and fixed prices. The court did not find any concerted action between BCBSM and any other party that resulted in a contract, combination, or conspiracy in restraint of trade or to fix prices. In its findings of fact, the trial court did state that BCBSM had admitted entering into the new agreement with 200 other participating clinics, but we find that this would not establish the necessary concerted action because there was no evidence that these 200 agreements were entered into for any purpose to restrain trade or fix prices against the clinics who did not sign the agreements.

In their verified complaint, plaintiffs alleged that there was a conspiracy between defendant and the United Auto Workers (UAW):

"108. For the past several months, the United Auto Workers and defendant have conspired to cause a modification of the reimbursement policy to providers of mental health services. Said conspiracy constitutes a refusal to deal on the part of BCBSM with therapists who are performing psychotherapy within acceptable community standards with a resultant loss of occupation by said therapists.

"109. BCBSM has acknowledged through its agent, Edward Mahle, as set forth in the attached affidavit of Norman R. Schakne, M.D., that the United Auto Workers had in fact conspired with Blue Cross and had 'directed' Blue Cross to make these changes.

"110. The aforementioned conspiracy further constitutes a refusal to deal in that the differentiation between the disciplines of psychotherapists in terms of reimbursement rates is totally unrelated to the competence and performance of said psychotherapists, and is in effect a price-fixing which will result in certain social

workers, including plaintiff Rude, being forced out of business."

The affidavit of Dr. Schakne states in part:

"3. On April 2, 1979, I had a phone conversation with Mr. Edward Mahle of the Non-Hospital Facility Reimbursement Section of Blue Cross and Blue Shield."

\* \* \*

"5. Upon my questioning Mr. Mahle regarding the prospective non-reimbursement for treatment rendered by a particular social worker with many years of experience in our clinic, Mr. Mahle indicated that it was the United Auto Workers that insisted on his definition of a therapist's qualifications and that Blue Cross had no control over this."

However, the trial court made no findings of fact regarding an alleged conspiracy between BCBSM and the UAW, and we find that, on the record, evidence of such a conspiracy is insufficient. The evidence must be significant and probative. *First National Bank of Arizona v Cities Services Co,* 391 US 253, 291; 88 S Ct 1575, 1593; 20 L Ed 2d 569, 593 (1968), *Aviation Specialties, Inc v United Technologies Corp,* 568 F2d 1186, 1192 (CA 5, 1978). Plaintiffs failed to show that the UAW had some control over BCBSM's decision-making with regard to the agreements between BCBSM and the clinics such that the UAW could dictate the terms of the agreements. The fact that the UAW and BCBSM may have conferred as to the terms of the participation agreements does not establish a contract, combination, or conspiracy in restraint of trade. *Human Resources Institute of Norfolk, Inc v Blue Cross of Virginia,* 484 F Supp 520 (ED Va, 1980). As stated in *Kreuzer v American Academy of Periodontology, supra,* 1038:

"The standard of proof for a conspriacy then requires something more than parallel behavior, and it is also not enough to prove that the two parties alleged to be co-conspirators merely exchanged information. See *Maple Flooring Manufacturers Ass'n v United States,* 268 US 563; 45 S Ct 578; 69 L Ed 1093 (1925). The parties must knowingly act in concert in order to restrain trade, they must share a common goal in such action, and they must intend to restrain trade."

Further, in *Virginia Academy of Clinical Psychologists v Blue Shield of Virginia,* 469 F Supp 552, 559 (ED Va, 1979), *remanded in part on other grounds* 624 F2d 476 (CA 4, 1980), the court stated that § 1 of the Sherman Act does not prohibit a business entity which needs information and advice from obtaining such information and advice from other knowledgeable business entities. Consultation with other groups does not necessarily indicate a contract, combination, or conspiracy between those groups to restrain trade or fix prices. A decision to implement a policy that coincides with a position taken by the group conferred with does not alone indicate that a contract, combination, or conspiracy has taken place or that the decision was not an independent one. An independent business decision does not form the basis of a contract, combination, or conspiracy in restraint of trade or to fix prices. Also, see *United States v American Tobacco Co,* 221 US 106, 179-180; 31 S Ct 632, 648; 55 L Ed 663, 693-694 (1911).

There was no proof in this case of any concerted action between BCBSM and any other party in regard to establishing the terms of the participation agreement in order to bring the participation agreement within the reach of § 1 of the Sherman Act. The proposed participation agreement was merely a proposal of the terms upon which

BCBSM was willing to reimburse the clinics for treatment provided to BCBSM subscribers. The Sherman Act is not intended to reach normal and usual contracts which further legitimate trade, nor is it intended to inhibit the intelligent conducting of business operations. *United States v American Tobacco Co, supra.* It has long been recognized that a business may unilaterally choose those with which it will conduct business and upon what terms. *United States v Colgate & Co,* 250 US 300; 39 S Ct 465; 63 L Ed 992 (1919). Therefore, finding no concerted action on this record, the Sherman Act is not applicable to the participation agreement proposed by BCBSM to the clinics.

Michigan's antitrust statute, MCL 445.701; MSA 28.31, is even more explicit than § 1 of the Sherman Act in requiring some concerted action:

"That a trust is a combination of capital, skill or arts by 2 or more persons, firms, partnerships, corporations or associations of persons, or of any 2 or more of them, for either, any or all of the following purposes:

"1. To create or carry out restrictions in trade or commerce;

"2. To limit or reduce the production, or increase or reduce the price of, merchandise or any commodity;

"3. To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity;

"4. To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this state;

"5. It shall hereafter be unlawful for 2 or more persons, firms, partnerships, corporations or associations of persons, or of any 2 or more of them, to make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they shall bind or have bound themselves not to

sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure or fixed value, or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article, commodity, or transportation between them or themselves and others, so as to directly or indirectly preclude a free and unrestricted competition among themselves, or any purchasers or consumers, in the sale or transportation of any such article or commodity, or by which they shall agree to pool, combine, or directly or indirectly unit any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected. Every such trust as is defined herein is declared to be unlawful, against public policy and void * * * ."

As a matter of fact, the preamble to the anti-trust statute makes clear that some concerted action is required:

"An Act to prevent trusts, monopolies and combinations of capital, skill or arts, to create or carry out restriction in trade or commerce; to limit or reduce the production, or increase or reduce the price, of merchandise or any commodity; to prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity; to fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption; to prescribe the powers and duties of certain state agencies; to void contracts made in violation of this act; to prohibit certain types of price discrimination; and to provide remedies and penalties." (Emphasis added.)

Our Court has recognized that plaintiffs in an

antitrust action need to prove the existence of a trust or combination and that defendant belonged to it, or acted for or in connection with it. *Metro Club, Inc v Schostak Bros & Co, Inc,* 89 Mich App 417; 280 NW2d 553 (1979), *Goldman v Loubella Extendables,* 91 Mich App 212, 219; 283 NW2d 695 (1979). Since we have found that there was no evidence that BCBSM acted or combined with any other entity or person to create or carry out a restraint of trade or to fix prices, we further find that the Michigan antitrust statute does not apply to this case.

Even if we were to find some evidence of concert of action thereby entitling plaintiffs to review of the antitrust claims, we also find that the agreement did not restrain trade or fix prices.

The trial court found that the proposed agreement by BCBSM was a restraint on trade because BCBSM would no longer reimburse the clinics for services performed by certain individuals who had previously been able to render services. The court found that this, thus, precluded those persons from practicing in the field of psychotherapy as the bulk of their patients were BCBSM subscribers. The record is not entirely clear as to the qualifications of the individuals who would no longer be reimbursed except that, as previously stated, they included a registered nurse, a person who had a doctoral degree in education, and others who had master's degrees in fields related to social work. The trial court found that nonreimbursement of these individuals is anticompetitive because it "freezes out" these people from the field of psychotherapy without regard to their qualifications and without any correlating benefit to the public. Further, the court found that it was detrimental to the public which should be entitled to treatment

by those persons regardless of the particular degree that person might hold.

We find no per se violation of antitrust law. Therefore, we must apply the "rule of reason" which was adopted by the United States Supreme Court in *Standard Oil Co of New Jersey v United States, supra,* and explained in *Board of Trade of Chicago v United States,* 246 US 231, 238; 38 S Ct 242; 62 L Ed 683 (1918):

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."[2]

In a letter from BCBSM to the clinics, explaining the changes between the old and new agreements, the following was stated regarding those persons who would qualify for reimbursement:

"Under the revised policy, BCBSM will recognize only those professional services performed by the following categories of mental health professionals:

---

[2] This rule was adopted by the Michigan Supreme Court in *People ex rel Attorney General v Detroit Asphalt Paving Co,* 244 Mich 119; 221 NW 122 (1928).

"Category 1. Board certified and board eligible psychiatrists

"Category 2. Licensed psychologists (as defined/administered under Public Act [PA] 368 of 1978)

"Category 3. Social Workers, Certified by the State of Michigan, with a Master's Degree in Social Work and Limited Licensed Psychologists (as defined/administered under 1978 PA 368)"

The public act referred to by BCBSM is the Public Health Code which regulates certain occupations related to health care. It is well established that the purpose of the statutes regulating health care professionals is to safeguard the public health and protect the public from incompetence, deception, and fraud. *Hill v Highland Park General Hospital,* 80 Mich App 334, 340; 263 NW2d 362 (1977). As a matter of fact, our state constitution, Const 1963, art 4, § 51, provides:

"The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health."

The Public Health Code details the regulations and procedures governing the health care professions. The criteria used for identifying health occupations for licensure[3] and regulation[4] is stated in

---

[3] MCL 333.16106(2); MSA 14.15(16106)(2) provides:

" 'License' means an authorization issued under this article to practice where practice would otherwise be unlawful. It includes an authorization to use a designated title which use would otherwise be prohibited under this article and may be used to refer to a health profession subfield license, limited license, or a temporary license."

[4] MCL 333.16108(2); MSA 14.15(16108)(2) provides:

" 'Registration' means an authorization only for the use of a designated title which use would otherwise be prohibited under this article. It includes specialty certification of a licensee."

MCL 333.16155; MSA 14.15(16155) and MCL 333.16156; MSA 14.15(16156):

"Sec. 16155. Criteria to be used in identifying health occupations for which licensure will be recommended are:

"(a) Licensure of health personnel shall be judged by its single purpose of promoting safe and competent health care for the public.

"(b) The scope of practice of the occupation is distinguishable from that of other licensed and unlicensed health occupations. Limitations on practice in the overall scope of practice shall be related to the competency and ability required of the individual.

"(c) The functions and responsibilities of individuals working in the scope of practice shall require independent judgment and action based on a substantive body of skill and knowledge.

"(d) The public cannot be effectively protected by means other than licensure.

\* \* \*

"Sec. 16156. Criteria to be used in identifying health occupations for which registration will be recommended are:

"(a) Registration of health personnel shall be judged by its purpose of establishing and identifying the basic minimum qualifications of the professional.

"(b) Minimum qualifications are established by acquisition of a prescribed body of skill and knowledge.

"(c) Recognizing that the public has limited ability to evaluate the qualifications of an individual related to a category of health professional, registration is a means of providing essential information to the public to increase its ability to make informed choices about the consumption of health services."

Part 182 of the Public Health Code, MCL 333.18201 *et seq.;* MSA 14.15(18201) *et seq.,* regulates the field of psychology. In *Nelles v Superintendent of Public Instruction,* 5 Mich App 47; 145

NW2d 795 (1966), *app dis, cert den* 389 US 9; 88 S Ct 85; 19 L Ed 2d 9 (1967), the Court found that the practice of psychology is a privilege which may be licensed by the state pursuant to its police powers. The state, in the public interest, may provide for the regulation and certification of professions. Through the Public Health Code, the state has regulated those health care professionals in the field of psychotherapy.

At the trial, BCBSM stated that the mental health benefit became a part of the UAW's medical benefits for implementation in 1966 as a result of negotiations between the UAW and the big three automakers. BCBSM was selected as the carrier. The contract between the UAW and the automakers contained definitions of approved therapists. The definition of psychiatric social worker was a person who has received a master's degree in social work from a university approved for training in social work at the graduate level by the National Association of Social Workers, or has an equivalent amount of training and experience to qualify for membership in the National Association of Social Workers, and is a member or is eligible for membership in a professional organization. However, this definition did not become a part of the participation agreement between BCBSM and the clinics. Certain social workers who did not have the qualifications specified above were reimbursed. Apparently, the qualifications specified in the definition are more stringent than the qualifications for licensure under Michigan's statute, as the state will license a social worker who does not have a master's degree in social work. It is not apparent that the qualifications for psychiatrists or psychologists under the agreement are more stringent that those under the statute.

Because the number of clinics and the amount BCBSM was paying on claims was increasing at the rate of 50% per year, in early 1976, BCBSM established a Mental Health Care Advisory Committee which consisted of eight members. Two members were appointed by each of the following: the Michigan Psychiatric Society, the Michigan Psychological Association, and the Michigan Chapter of the National Association of Social Workers. The remaining two members were appointed by the Association of Community Mental Health Agency Directors and the Community of Mental Health Associations of Michigan. The committee recommended that BCBSM reimburse only for services by a psychiatrist, psychologist, or social worker with a master's degree. It is BCBSM's position that the committee's advice constituted a declaration of what the professionals in the mental health field regard as an appropriate standard for the therapists who are delivering mental health benefits to BCBSM subscribers. Pursuant to the recommendation of the committee, BCBSM adopted the policy that only psychiatrist, psychologists, and social workers with master's degrees would be reimbursed. BCBSM would no longer reimburse those social worker therapists who did not have master's degrees in social work. Apparently, psychiatrists and psychologists were not affected.

BCBSM's requirement that the individual treating its subscribers must be a psychiatrist, licensed psychologist, social worker with a master's degree, or a limited licensed psychologist as regulated health care professionals set forth in the Public Health Code, ensures that the subscribers will be treated by only those who are competent to provide psychotherapy. Even though the educational

requirements for a social worker are more stringent than those in the Public Health Code, we find no violation of antitrust law by restricting reimbursement to those services provided by therapists with certain educational qualifications. This protects the public from psychotherapists not qualified to render such treatment. The policy is reasonable and does not constitute a restraint on trade.

We also find that BCBSM has not fixed prices in violation of the antitrust laws. The trial court found that price-fixing was established on two bases: (1) There is no reasonable benefit to the general public, and in particular, to BCBSM subscribers, for the three-rate structure arbitrarily and unilaterally set by BCBSM to reimburse therapists for identical services based solely on their educational qualifications disregarding their experience in the field; and (2) fixing a set fee for reimbursement and preventing clinics from charging either over or under that set fee violates antitrust law for the reason that there is no correlating benefit resulting from the restriction imposed by BCBSM on the clinics not to charge the general public less than the amount it charges the BCBSM patients.

The trial court's first finding regarding price-fixing is clearly erroneous because the three classifications of psychotherapists, (1) psychiatrists, (2) licensed psychologists, and (3) social workers with master's degrees and limited licensed psychologists, do not perform identical services. By reason of their educational qualifications, each is competent to perform different services. Further, reimbursement at different levels conforms reimbursement to the qualifications and expertise of the various levels of therapists who provide treatment. We must presume that there is a difference in the

salaries paid by the clinics to these therapists based, for the most part, on educational qualifications. Therefore, there is no reason why a clinic should not be reimbursed at different rates for services rendered by persons with distinct educational qualifications. Moreover, it is inconceivable that there could be a rate structure based on each individual therapist's experience as the trial court seems to contend there should be.

Furthermore, there is a benefit to the public and to BCBSM subscribers resulting from BCBSM's use of a graduated rate reimbursement plan. If the bulk of BCBSM subscribers are treated by limited licensed psychologists, BCBSM should not have to reimburse the clinics at the same rate it would reimburse for treatment by psychiatrists. The less BCBSM has to reimburse the clinics for services to its subscribers, the lower its rates will be to the subscribers. Payment on a graduated scale is reasonable because it is directly related to the competency and ability of the individual who is treating the subscriber and the amount of treatment rendered by psychotherapists in each of the three established categories.

Further, there was absolutely no evidence to support the trial court's finding that the rates were set arbitrarily. Although the evidence established that under the old agreement the clinics were reimbursed on the average of $40 for all therapists, whether a psychiatrist or a social worker, for each session, there was no evidence as to how this amount was established. BCBSM stated that a graduated rate was established because it was more equitable in terms of recognizing the various levels of therapists who provide treatment. The agreement stated that the rates will be reviewed annually and updated, if neces-

sary, to assure continued quality care at a reasonable cost. Also, the proposed agreement does provide that an appeal may be filed by a BCBSM participating OPC program which believes that the maximum rates established by this change in policy are insufficient because of unusual or unique provider circumstances. Therefore, we find that the trial court clearly erred in determining that the graduated rate schedule was arbitrary since there was a reasonable basis for changing from one rate for all therapists to graduated rates based on the therapist's qualifications. There was no basis for the trial court's finding that BCBSM had fixed rates in violation of the antitrust laws.

The trial court's second finding regarding price-fixing is also clearly erroneous. The agreement simply does not state that the clinics are prevented from charging the public either over or under the fees set by BCBSM for reimbursement for treatment to its subscribers. Rather, the rates set by BCBSM for reimbursement are ceiling rates and article III, paragraph 4, of the agreement states:

"Provider agrees to bill BCBSM for Covered Services at not more than the same level of charges which the Provider has in effect for patients who are not entitled to Covered Services but who receive services similar in character to Covered Services."

There is no fixing of prices in violation of antitrust law by BCBSM's provision in the participating agreement that clinics may not charge BCBSM more than what it charges the public. This is only good business sense. The clinics are free to charge the public whatever they want, and BCBSM has no control over that. Therefore, the trial court clearly erred in finding that BCBSM fixed prices in violation of antitrust laws.

Reversed. Costs to be paid by plaintiffs.