**WXON–TV, INC., a Michigan corporation, Plaintiff,**

v.

**A.C. NIELSEN COMPANY, a Delaware corporation, Defendant.**

No. 89–70632.

United States District Court,
E.D. Michigan, S.D.

July 2, 1990.

See also, 742 F.Supp. 418.

Bruce Leitman, Bloomfield Hills, Mich., for plaintiff.

Marc E. Raven, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I.

Plaintiff WXON–TV, Inc. (WXON) operates a television station in Oakland County, Michigan. In 1983, plaintiff entered into a contract with defendant A.C. Nielsen Co., (Nielsen) under which Nielsen was to provide statistical estimates of projected viewing audiences which would be used for the purposes of marketing advertising time. WXON alleges that over a thirteen month period, Nielsen substantially underestimated its market share, resulting in a significant loss of advertising revenue. It sues for breach of contract (count I), breach of implied warranty of merchantability (count II), and breach of implied warranty of fitness for a particular purpose (count III). Nielsen moves for summary judgment, arguing that contractual disclaimer language limits plaintiff's remedy to the refund of its fees, that it exercised reasonable efforts to obtain statistically valid ratings estimates, and that the Uniform Commercial Code (UCC) warranties do not apply to the contract. The Court agrees that the UCC has no application to this contract and the limitation of damages clause is valid. However, the Court finds that there is a genuine issue of material fact as to whether Nielsen used reasonable efforts to provide WXON with data of the highest quality practicable and the case must proceed to trial on that issue.

### II.

In 1983, WXON and Nielsen entered into a seven-year contract whereby Nielsen would provide television ratings data to WXON. Nielsen's television ratings or audience measurements are statistically based. Since Nielsen cannot monitor every television set in a designated market area (DMA), it uses a limited sampling of the audience from which it generates statistically appraisals. To insure the validity of the sample, WXON contends that Nielsen must draw its data from a statistically appropriate cross section of the community being measured. Nielsen adopts "universe estimates" regarding the community and then applies statistical sampling techniques

against the universe in collecting and processing the data for its reports.

WXON claims that from June 1985 to July 1986, Nielsen drew ratings statistics from a population sample which significantly under-represented black households. For relevant periods during this litigation, WXON submits that Nielsen's universe estimate showed a certain percentage of the people in the Detroit DMA residing in households headed by blacks. WXON argues that Nielsen was aware at the time that it was monitoring significantly fewer black households than were necessary to assure a statistically valid sample. WXON concedes that some variance between the sample and the universe estimate is allowed, however Nielsen permitted too large a variance to exist without correction. The result was an under-reporting of black viewers in the Detroit DMA and a concomitant underestimate of the number of black households reached by WXON. As a result, customers were willing to pay substantially less for advertising time than they would have if Nielsen had accurately reported WXON's ratings.

### III.

#### A.

■ Nielsen contends that the language of the contract bars WXON from maintaining an action for consequential damages arising from a breach of the contract. Nielsen makes reference to paragraph D.5 of the agreement, which provides in part:

(a) NIELSEN MAKES NO WARRANTIES EXPRESS OR IMPLIED, CONCERNING THE DATA CONTAINED IN ITS ANALYSES. Nevertheless, Nielsen will use all reasonable efforts to provide Client with data of the highest quality practicable.

\*    \*    \*    \*    \*    \*

(c) Responsibility for Errors. If any material errors, inaccuracies or omissions should occur in any NSI Analysis or data, it will be Nielsen's policy, where feasible, to furnish appropriate correction notices, but Nielsen shall not be liable in breach of contract or otherwise.

In the event of errors, inaccuracies or omissions, Client expressly waives any claim against Nielsen. Nielsen and any person acting on its behalf shall not be liable for any loss, injury, or damage of any kind caused in whole or part either by its or his action or inaction, whether or not negligent, or by contingencies beyond Nielsen's control, in compiling any NSI Analysis or data or in delivering or communicating the same to the Client or others, or from the use of publication of the same by Client or others.

\*    \*    \*    \*    \*    \*

(e) In no event shall Nielsen be liable for Client's lost profits, goodwill or any other special or consequential damages.

WXON claims this waiver of remedies provision is unconscionable and should not be enforced. The Court does not agree.

As a preliminary matter, there is a dispute as to which state's law governs this contract. Nielsen argues that the Court should enforce the contractual choice of law clause in the agreement, which provides that law of the State of Illinois shall govern the contract. Nielsen further states that under Illinois law, the limitation of liability provision in the Service Agreement would be upheld. *See Dillman & Associates v. Capitol Leasing Co.*, 110 Ill. App.3d 335, 442 N.E.2d 311, 66 Ill.Dec. 39 (1982); *Neal v. Lacob*, 31 Ill.App.3d 137, 334 N.E.2d 435 (1975). WXON contends that Michigan courts will not enforce foreign law which violates the public policy of the state, *see Liberthal v. G.F. Indemnity Co.*, 316 Mich. 37, 24 N.W.2d 547 (1946); *Mt. Ida School for Girls v. Rood*, 253 Mich. 482, 235 N.W. 227 (1931), and Michigan has expressed a strong interest in allowing parties to avoid unconscionable contracts, *see Allen v. Mich. Bell Telephone Co.*, 18 Mich.App. 632, 171 N.W.2d 689 (1969). The Court need not resolve the question definitively. In this case, the same result would inhere regardless of whether the Court applied the law of Michigan or Illinois. For the purpose of addressing the unconscionability issue, however, the Court will analyze plaintiff's arguments under the law of Michigan.

■ The appropriate starting point for such a discussion is *Allen v. Mich. Bell Telephone Co.*, 18 Mich.App. 632, 171 N.W.2d 689 (1969). In *Allen,* an insurance agent paid to have an advertisement placed in Michigan Bell's yellow pages. After accepting the plaintiff's order, Michigan Bell failed to publish the ad. Plaintiff filed suit and Michigan Bell raised as its defense the existence of a limitation of damages clause in the contract. The Court found the limitation clause unconscionable because at the time of contracting, plaintiff had no realistic alternative but to accept the terms offered. The *Allen* court formulated a two prong test for determining whether a contractual provision is unconscionable:

(1) what is the relative bargaining power of their parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?; (2) Is the challenged term substantively unreasonable?

18 Mich.App. at 637, 171 N.W.2d 689. The first prong of the test has been described as the procedural unconscionability inquiry, because it looks at the relative bargaining power of the parties and the circumstances under which the contract was made. The second prong is the substantive unconscionability inquiry, which focuses on the contractual terms themselves to determine whether they are commercially reasonable. *Johnson v. Mobil Oil Corp.*, 415 F.Supp. 264, 268 (E.D.Mich.1976). The *Allen* court cautioned that procedural unconscionability alone will not invalidate a contract; rather, the provision must be both substantively and procedurally unconscionable before it will be struck.

[M]erely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced.

18 Mich.App. at 638, 171 N.W.2d 689.

■ Unconscionability will rarely be found in a commercial contract. *U.S. Fibres v. Proctor & Schwartz, Inc.*, 509 F.2d 1043, 1048 (6th Cir.1975). The law presumes that business people are fully competent to enter into contracts and obligate themselves to perform in any manner they wish. The courts have no authority to rewrite the terms of a contract because they might feel that it was an unwise agreement for a party to have entered into. *Michigan Association of Psychotherapy Clinics v. Blue Cross,* 101 Mich.App. 559, 573–74, 301 N.W.2d 33 (1980), *set aside in part on other grounds,* 411 Mich. 869, 306 N.W.2d 101 (1981), *after remand* 118 Mich.App. 505, 325 N.W.2d 471 (1982). *Allen* has not authorized courts in Michigan to police contracts wholesale for mere "unreasonableness." Rather, the case stands for the more limited proposition that:

where goods or services used by a significant segment of the public can be obtained from only one source, or from limited sources on no more favorable terms, an unreasonable term in a contract for such goods or services will not be enforced as a matter of public policy.

18 Mich.App. at 640, 171 N.W.2d 689.

As to procedural unconscionability, WXON argues that, like Mr. Allen, it did not have a meaningful choice in selecting a ratings service. It states that there are only two companies which provide statistical data on television ratings: Nielsen and the Arbitron Ratings Company (Arbitron). According to WXON, both companies' service contracts include precisely the same restrictive damages provision.[1]

The Court is not persuaded by WXON's argument. The *Allen* court was mainly concerned with the disproportionate bargaining power wielded by a public utility.

1. In this regard, WXON–TV is somewhat disingenuous. In arguing that it had no meaningful choice as to a limitations of damages clause, it claims that the waiver clauses in the Nielsen and Arbitron clauses were identical. However, in attempting to distinguish the Nielsen's limitations provision from the Arbitron clause at issue in *Birmingham Television Corp. v. Arbitron Ratings Co.*, No. 86–AR–1197–S (N.D.Ala. Apr. 27, 1987), WXON argued that Arbitron's limitations clause was substantially more generous than Nielsen's. *Birmingham Television* held that the limitations clause in Arbitron's service contract was not unconscionable. *See infra.*

In placing his ad with the yellow pages, Mr. Allen was dealing with a company that possessed a monopoly on yellow pages advertising. Moreover, Mr. Allen was faced with form contract whose terms were non-negotiable. In this case, the facts and circumstances do not involve the existence of a monopoly. Even though only two sources of ratings information were available, the Court finds that there was sufficient evidence of competition to render the analogy to *Allen* inapposite. It appears that at the time the contract with Nielsen was negotiated, WXON was also talking with Arbitron about a possible service agreement. Indeed, in previous years WXON had retained the services of Arbitron over those of Nielsen. Because of the possibility that WXON would ultimately decide to sign with Arbitron, Nielsen agreed to certain requested revisions of its standard service contract, including substantial price reductions and the addition of an early termination clause.[2] Thus, the evidence strongly suggests that the contract was the result of an arm's-length negotiation between two sophisticated and experienced business entities of comparable bargaining power.

Therefore, the Court finds that the concerns expressed by the *Allen* court are not present in this instance. Evidence of a bargained for contract exists. There is no evidence that WXON was in a take-it-or-leave-it situation. The *Allen* court specifically noted that a major reason underlying its finding of unconscionability was the fact that there was no reasonable, cost-effective substitute for Yellow Pages advertising and that plaintiff could not have realistically done business without it. *Allen*, 18 Mich.App. at 640, 171 N.W.2d 689. In this case, there is evidence that on at least three separate occasions since 1968, WXON has gone without a subscription for ratings information.

In addition, it is doubtful that the limitation of liability clause in this contract was substantively unconscionable. The potential damages resulting from inaccuracies in ratings data could be enormous. Moreover, they would be extremely difficult to ascertain with any precision. It was not unreasonable for Nielsen to attempt to protect itself from this kind of unpredictable liability. Nielsen did not hold itself out as the guarantor of the accuracy of its data. It merely agreed to use its best efforts to assure the most accurate statistics practicable. The service agreement was perfectly clear that this was the extent of its undertaking.

At least one other federal court has held that a similar limitation of damages clause in a ratings service agreement was not substantively unconscionable. In *Birmingham Television Corp. v. Arbitron Ratings Company, Inc.*, No. 86–AR–1197–S (N.D.Ala. Apr. 27, 1987), Birmingham Television (Birmingham) was suing Arbitron for breach of its service agreement. Arbitron argued that Birmingham could not recover consequential damages because of a limitation of liability clause in the service agreement, which stated:

THE SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, FOR ARBITRON'S BREACH OF ANY WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS, AND THE SOLE AND EXCLUSIVE REMEDY FOR ARBITRON'S LIABILITY OF ANY KIND, INCLUDING WITHOUT LIMITATION LIABILITY FOR NEGLIGENCE AND DELAY WITH RESPECT TO THE ARBITRON RATINGS AND ALL PERFORMANCE PURSUANT TO THIS AGREEMENT, SHALL BE LIMITED TO THE REFUND (FOR EACH REPORT MATERIALLY AFFECTED BY ANY SUCH BREACH) TO STATION OF AN AMOUNT EQUAL TO THE ADJUSTED MONTHLY CHARGES PAYABLE BY THE STATION DURING THE CURRENT TERM YEAR DIVIDED BY THE NUMBER OF REPORTS PRODUCED ANNUALLY BY ARBI-

---

**2.** It is undisputed that during the course of these rather extensive negotiations, WXON never requested that the limitations of damages clause in Nielsen's service contract be deleted or revised.

TRON FOR THE MARKET. IN NO EVENT SHALL ARBITRON BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES NOR SHALL IT BE SUBJECT TO INJUNCTIVE RELIEF WITH RESPECT TO THE PUBLICATION OF ANY REPORT. THE STATION UNDERSTANDS THAT THE REPORTS EITHER WOULD NOT BE PREPARED, OR WOULD BE AVAILABLE ONLY AT A SUBSTANTIALLY INCREASED LICENSE FEE, WERE IT NOT FOR THE LIMITATIONS OF LIABILITIES AND REMEDIES AS SET FORTH IN THIS SECTION.

Construing the agreement under Maryland law pursuant to a contractual choice of law clause in the contract, the court found that the limitation of remedies clause was not void as against public policy. It found that the clause was clear and unambiguous and that it did not represent oppression or overreaching by Arbitron. The limitation of remedies clause in the Arbitron agreement is essentially identical to that contained in the Nielsen agreement.

The Court is satisfied that under the law of Michigan, Nielsen's limitation of damages clause would be upheld, as well. The case of *St. Paul Fire & Marine Insurance Co. v. Guardian Alarm Co.*, 115 Mich. App. 278, 320 N.W.2d 244 (1982), is instructive. In *St. Paul Fire*, the Guardian Alarm Co. (Guardian) provided direct-wire burglar alarm services to businesses for a monthly fee. The service agreement provided that because it would be extremely difficult to fix the actual damages resulting from a failure of the system, Guardian's liability would be limited to the refund of six monthly payments or $250, whichever was less, even if the loss was occasioned by Guardian's own negligence. Plaintiff's subrogee's business was burglarized and the system failed to function properly. Plaintiff sued Guardian for negligence and breach of contract and Guardian interposed its limitation of liability provision as a defense. Plaintiff argued that the clause was unconscionable. The Michigan Court of Appeals noted as a preliminary matter that contracts limiting liability for damages caused by a party's ordinary negligence is not necessarily contrary to public policy. It went on to find that the terms of this specific contract were not unconscionable.

> The contract clause limiting defendant's liability to the aggregate of six monthly payments or $250 is manifestly reasonable under the circumstances of this case. Defendant is not in the insurance business. Rather, it provides an alarm service for a specific sum. That sum is not a premium for theft insurance. The contract in question made that clear. Under these circumstances, a clause limiting defendant's liability in the event that the alarm system did not work properly is not unconscionable.

115 Mich.App. at 284, 320 N.W.2d 244.

The Court finds that the facts of *Birmingham Television* and *St. Paul Fire* are closely analogous to the case at hand and the same result should inhere. WXON has failed to show that the terms of the contract are either procedurally or substantively unconscionable. Therefore, the limitation of damages clause will be enforced.

### B.

■ In the alternative, WXON argues that even if the terms of the contract are not unconscionable, then the limitation clause is still unenforceable because it renders Nielsen's obligations under the contract illusory. Specifically, WXON claims that under D.5(c) of the contract, any material error, inaccuracy or omission on Nielsen's part shall not make Nielsen liable for breach of contract. According to WXON, the contract's waiver language effectively excuses Nielsen from having to do anything it does not consider feasible in response to its own errors. WXON claims that the limitation of remedies clause thus fails of its essential purpose because Nielsen could, in fact, make errors and not be held responsible. WXON claims Nielsen failed to correct a significant defect in its Detroit sample for more than a year, yet now argues that WXON is without a remedy.

The Court does not agree with WXON's characterization of the contract. The

agreement expressly states that if Nielsen fails under the contract, WXON may recover a refund or receive a credit in the amount paid. Paragraph D.5(d) of the agreement states:

> If Nielsen shall fail, for any reason, to furnish any Regular or Special Data Analysis, under or as required by this Agreement, client will accept, in lieu thereof, and as Client's sole and exclusive remedy, a refund or credit in the amount paid for such Analysis and Nielsen's liability for such failure shall be limited to the said refund or credit....

The Court finds that this language, taken in conjunction with the obligations assumed by Nielsen in section D.5(a) of the agreement, is sufficient to create a binding mutual contract.

### IV.

The central question is whether or not Nielsen is liable under the contract. Paragraph D.5(a) provides that Nielsen had a "duty to use all reasonable efforts to provide WXON with data of the highest quality practicable." The Court finds that WXON's proffered expert testimony raises a genuine issue of material fact as to whether or not Nielsen's efforts were, in fact, reasonable. Nielsen contends that the affidavits supplied by WXON's experts only state that Nielsen did not achieve a particular result. According to Nielsen, the affidavits fail to set forth specific facts in order to have any probative value.

The Court finds that the affidavits supplied by WXON are sufficient to preclude summary judgment. While they may not be lengthy or overly detailed, they do set forth specific facts showing the existence of a genuine issue for trial. According to these affidavits, Nielsen's own data and reports show a bias in the distribution of Nielsen's samples as compared with the universe estimates in several demographic areas within the Detroit DMA. The affidavits also state that this under-representation for more than a year was unreasonable and likely distorted the ratings produced by Nielsen. While these affidavits may not be sufficient to prove WXON's case, they do create a genuine issue of fact.

### V.

Counts II and III allege a breach of implied warranties of merchantability and fitness for particular purpose. The Court finds that this contract was predominantly a contract for services and not goods. Even if the end result of Nielsen's work comes in the form of paper reports, the actual work contracted for was Nielsen's expertise regarding audience data. The dispute in this instance is not so much over the reports or what they indicate, but rather over how Nielsen produced the figures it gave to WXON. WXON claims that Nielsen improperly measured black households. In addition, WXON claims Nielsen failed to adequately correct its error in order to get the sample closer to the universe estimate. The Court finds that this suit involves a claim of alleged defective service, not a defective product.

WXON's attempt to compare Nielsen's report with the lease of equipment is unpersuasive. Clearly the dominant purpose of the contract was for Nielsen to provide an ongoing service to WXON. Therefore, pursuant to applicable Illinois law, this contract is governed by general contract law instead of the UCC. *Pitler v. Michael Reese Hosp.*, 92 Ill.App.3d 739, 415 N.E.2d 1255, 1257, 47 Ill.Dec. 942, 944 (Ill.App. 1980). As a result, the warranty provisions of the UCC are inapplicable.

### VI.

Based upon the foregoing, Nielsen's motion for summary judgment is DENIED as to count I and GRANTED as to counts II and III. The case will proceed to trial on the issue of whether Nielsen failed to use all reasonable efforts to provide WXON with data of the highest quality practicable. The contractual limitation of damages provision will stand, however, and WXON is limited to recovering its payments to Nielsen during the relevant period.

SO ORDERED.